[No. A094061. First Dist., Div. Two. Apr. 15, 2002.]

CHILDREN'S HOSPITAL AND MEDICAL CENTER et al., Plaintiffs and Respondents, v.
DIANA BONTA´, as Director, etc., et al., Defendants and Appellants.

COUNSEL

Bill Lockyer, Attorney General, Stephanie Wald and Asher Rubin, Deputy Attorneys General, for Defendants and Appellants.

Law Offices of Michael S. Sorgen, Michael S. Sorgen; and Dean L. Johnson for Plaintiffs and Respondents.

OPINION

KLINE, P. J.—Respondents, 11 out-of-state hospitals[1] that have provided services to California residents covered by the Medi-Cal program, commenced this action against appellants, Director of the state Department of Health Services, and the department itself (collectively DHS or Department), claiming that the difference between the reimbursement of in-state and out-of-state hospitals for costs incurred in the treatment and care of Medi-Cal beneficiaries violated not just state and federal laws but the commerce clause (U.S. Const., art. I, § 8, cl. 3) and equal protection provisions of the federal and state Constitutions. The trial court agreed with respondents, awarded damages, and granted respondents prejudgment interest and attorney fees. We shall lower the amount of prejudgment interest allowed but otherwise affirm the judgment.

STATEMENT OF THE CASE AND FACTS

The state Medi-Cal program effectuates the federal Medicaid program established under title XIX of the Social Security Act (42 U.S.C. § 1396 et seq.) (the Medicaid Act), which authorizes the payment of federal funds to states to defray the cost of providing medical assistance to low-income persons. (See *Rite Aid of Pennsylvania, Inc. v. Houstoun* (3d Cir. 1999) 171 F.3d 842, 845.) The state reimburses California hospitals for services to Medi-Cal beneficiaries in one of two ways: (1) according to a specific contractual rate of payment negotiated between the hospital and the California Medical Assistance Commission (CMAC); or (2) on the basis of actual

---

[1]Respondent hospitals are: Washoe Medical Center in Reno, Nevada; St. Mary's Regional Medical Center (Reno, Nev.); Rogue Valley Medical Center (Medford, Ore.); St. Joseph's Hospital and Medical Center (Phoenix, Ariz.); Desert Samaritan Medical Center (Mesa, Ariz.); Good Samaritan Regional Medical Center (Phoenix, Ariz.); Havasu Samaritan Regional Hospital (Lake Havasu, Ariz.); Maryvale Samaritan Medical Center (Phoenix, Ariz.); Thunderbird Samaritan Medical Center (Glendale, Ariz.); Mesa Lutheran Hospital (Mesa, Ariz.); and Desert Springs Hospital (Las Vegas, Nev.). Seven smaller out-of-state hospitals with lesser claims that were originally named as plaintiffs were dismissed from the action during trial.

costs, calculated by formulas set forth in the California Code of Regulations. (Cal. Code Regs.,[2] tit. 22, §§ 51536, 51539, 51541, 51546, 51549.) California hospitals that have not negotiated contracts with CMAC, and are reimbursed on the basis of their actual costs, are paid the lesser of (1) their customary charges; (2) allowable costs determined by the Department; (3) the "[a]ll inclusive rate per discharge limitation" (ARPDL);[3] or (4) the "peer grouping rate per discharge limitation" (PGRPDL).[4] (Tit. 22, § 51546, subd. (a).)

The complex formulas used to determine the reimbursement to which noncontract California hospitals are entitled require development of an input price index (consisting of "a market basket classification of goods and services purchased by hospitals, a corresponding set of market basket weights derived from each hospital's own mix of purchased good and services, and a related series of price indicators" (tit. 22, § 51536, subd. (g))[5] and a hospital cost index (consisting of "an input price index and an allowance for changes in service intensity").[6] (Tit. 22, § 51536, subd. (f).) The regulations also require classification of hospitals' fixed and variable costs, application of an annual service intensity allowance and volume adjustment in certain circumstances. In-state hospitals are placed into one of 36 enumerated peer group categories (tit. 22, § 51553) and reimbursement is payable "at no more than the 60th percentile rate per discharge of the peer group to which the hospital is assigned by the Department." (Tit. 22, § 51539, subd. (b).) Such hospitals may request administrative adjustments

---

[2]All further references to title 22 will be to the California Code of Regulations unless otherwise specified.

[3]The "[a]ll-inclusive rate per discharge" (ARPD) is the "per discharge dollar limit on Medi-Cal reimbursable costs prior to the application of the peer grouping inpatient reimbursement limitation." (Tit. 22, § 51545, subd. (a)(4).) The ARPDL is the all-inclusive rate per discharge multiplied by the number of Medi-Cal discharges. (Tit. 22, § 51545, subd. (a)(5).)

[4]The "peer grouping rate per discharge limitation" is the "60th percentile ARPD of each provider's peer group multiplied by the provider's number of Medi-Cal discharges." (Tit. 22, § 51545, subd. (a)(71).) The "peer group" is "a group of hospitals with similar characteristics that are grouped together for purposes of determining reimbursement limitations." (Tit. 22, § 51545, subd. (a)(69).)

[5]"Market basket categories" pertain to such expenses as physicians' salaries, other professional fees, food, drugs, medical instruments and appliances, rubber and plastics, travel, apparel and textiles, and business services. (Tit. 22, § 51536, subd. (g)(3).)

[6]"Service intensity" is defined in the regulations (with characteristic prolixity) as "the necessary changes in the character of the services provided to each patient, including changes in applicable technology, qualitative changes in personnel, quantitative changes in personnel, qualitative changes in supplies, drugs, and other materials, and quantitative changes in supplies, drugs, and other materials. Service intensity does not include changes in the types of patients and illnesses treated." (Tit. 22, § 51536, subd. (b)(8).) The sources of the "price indicators" pertinent to each "market basket category" are for the most part either the consumer price index, the producer price index or statistics periodically published by the United States Department of Labor, Bureau of Labor Statistics. (*Ibid.*)

of the all-inclusive reimbursement rates and limits (tit. 22, §§ 51536, subd. (j), 51539, subd. (d)(1), 51550) and may appeal decisions on administrative adjustments (tit. 22, §§ 51536, subd. (k), 51539, subd. (d)(3)).

The elaborate formulae designed to sensitively determine the costs in-state hospitals incur in treating Medi-Cal patients have no application to out-of-state hospitals that treat such persons. Nor are out-of-state hospitals permitted to negotiate reimbursement contracts with CMAC. The methodology DHS uses to reimburse out-of-state hospitals is prescribed by subdivision (i) of Welfare and Institutions Code section 14105.15, which was enacted in 1992 (hereafter subdivision (i)). This statute provides that "reimbursement for out-of-state acute inpatient hospital services provided to Medi-Cal beneficiaries shall not exceed the current statewide average of contract rates for acute inpatient hospital services negotiated by the California Medical Assistance Commission or the actual billed charges, whichever is less." (*Ibid.*) In addition to their constitutional claims, respondents challenged DHS's application of subdivision (i) on the ground the Department "does not pay out-of-state hospitals the 'current' statewide average of contract rates, but rather uses an average of the different rates paid in-state contract hospitals on December 1 of the previous year." The complaint states that "[i]n an inflationary economy, such as the one that hospitals operate in, last year's average rate is always less than the 'current' rate."

Furthermore, while out-of-state hospitals may request administrative adjustments to the rate of reimbursement, administrative decisions to grant or deny such adjustments may not be appealed and are final. (Tit. 22, § 51543, subd. (b).) This contrasts with the rights of in-state hospitals, which may appeal denial of an adjustment administratively and, if need be, judicially. (Tit. 22, § 51539, subd. (d)(3).)

Under the reimbursement methodology used by DHS prior to the 1992 enactment of subdivision (i), out-of-state hospitals were reimbursed "at a percentage of allowable billed charges based on Medicaid information obtained from the Medicaid program for the state of location." (Tit. 22, former § 51543, subd. (a) [amended 1992].) The percentage of reimbursement was determined by one of five alternative methodologies, depending on the extent of the information made available to DHS. (*Ibid.*) Respondents allege, and the trial court essentially agreed, that under the prior reimbursement methodology California paid out-of-state hospitals 65 percent of their charges. Under the new scheme, respondents receive only 38 percent of their charges.

The states in which respondent hospitals are variously located—Nevada, Arizona and Oregon—prohibit them from refusing to treat Medi-Cal patients. (See *Orthopaedic Hospital v. Belshe* (9th Cir. 1997) 103 F.3d 1491,

1498 ["hospitals have a legal obligation to provide those services regardless of the level of Medi-Cal reimbursement rates"].) Because they must treat such persons, respondents have incurred substantial shortfalls in reimbursement based on a comparison of the amounts they now receive to the amounts they would have received under the prior rates.

### The Federal Proceedings

In 1995, before they commenced this state proceeding, respondents and other hospitals filed an action against DHS in the United States District Court for the Northern District of California (*Children's Hosp. and Medical Center v. Belshe*, No. C-95-1076 MHP), alleging that California's reimbursement scheme for out-of-state hospitals did not comply with the so-called Boren Amendment to the Medicaid Act (42 U.S.C. former § 1396a(a)(13)(A); see Historical Notes, 42 U.S.C.A. (2001 supp.) foll. § 1396a, p. 286 [repealed]), and seeking declaratory and injunctive relief. The federal action sought no damages but only declaratory relief invalidating the existing reimbursement scheme, compelling DHS to replace it with a more equitable system.

Prior to enactment of the Boren Amendment, states that participated in the federal Medicaid program were required to reimburse hospitals for the reasonable cost of providing inpatient services, which was ordinarily accomplished through retrospective payments based on a hospital's costs for specified services. (See *West Virginia University Hospitals, Inc. v. Casey* (3d Cir. 1989) 885 F.2d 11, 15, affd. on other grounds (1991) 499 U.S. 83 [111 S.Ct. 1138, 113 L.Ed.2d 68].) The Boren Amendment required states to prospectively establish reimbursement rates that "are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services.[7] The measure had two purposes: to encourage health care providers to meet a reasonable rate or absorb the loss if their costs exceeded that rate and to provide states greater flexibility in determining the method of payment. (Sen.Rep. No. 97-139, 1st Sess., p. 478 (1981), reprinted in 1981 U.S. Code Cong. & Admin. News, p. 744; see also *Wilder v. Virginia Hospital Assn.* (1990) 496 U.S. 498, 515, fn. 13 [110 S.Ct. 2510, 2520, 110 L.Ed.2d 455]; *Folden v. Washington State DSHS* (9th Cir. 1992) 981 F.2d 1054, 1056.)

---

[7]The Boren Amendment required that a state medical assistance plan provide "for payment . . . under the plan through the use of rates (determined in accordance with methods and standards, developed by the State . . . and which, in the case of hospitals, take into account the situation of hospitals which serve a disproportionate number of low income patients with special needs . . .) which the State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services . . . ." (42 U.S.C. former § 1396a(a)(13)(A).)

In orders dated January 9, 1997, and February 5, 1998, United States District Court Judge Marilyn Hall Patel denied DHS's motion for summary judgment, determined that the procedural and substantive requirements of the Boren Amendment apply equally to in-state and out-of-state hospitals and found that DHS failed to meet its procedural requirements in setting reimbursement rates for out-of-state hospitals. Judge Patel specifically held that DHS did not discharge its obligation under the Boren Amendment to make requisite adjustments in the payments to out-of state hospitals that "serve a disproportionate share of low-income patients with special needs."

In her 1998 order, Judge Patel noted that in 1997, while the action before her was pending, portions of the Boren Amendment were repealed and revised by section 4711 of the Balanced Budget Act of 1997 (Pub.L. No. 105-33 (Aug. 5, 1997) 11 Stat. 251.) Section 4711 eliminated the "findings" and "assurances" methodology prescribed by the Boren Amendment and required instead that states create a "public process for determination of rates of payment under the [medical assistance] plan." (42 U.S.C. § 1396a(a)(13)(A).) Under the new statute, states must allow "providers, beneficiaries and their representatives, and other concerned State residents" (42 U.S.C. § 1396a(a)(13)(A)(ii)) a reasonable opportunity to review and comment on "proposed rates, the methodologies underlying the establishment of such rates, and justifications for the proposed rates." (42 U.S.C. § 1396a(a)(13)(A)(i).) Section 4711 also requires that rates "take into account . . . the situation of hospitals which serve a disproportionate number of low-income patients with special needs." (42 U.S.C. § 1396a(a)(13)(A)(iv).) As Judge Patel observed, the foregoing requirements of section 4711 "affect[] only payments made to out-of-state hospitals for items and services furnished on or after October 1, 1997."[8] However, in December 1997 the Health Care Financing Administration (HCFA), the federal agency responsible for overseeing operation of the Medicaid Program, authorized states to continue to use payment methodologies approved under the Boren Amendment standard notwithstanding its repeal. Pursuant to this authority, DHS continues to administer its Medi-Cal program by using the Boren Amendment methodology, but only with respect to in-state hospitals.

At the end of her 1998 order, Judge Patel allowed that her determination that the Boren Amendment applied to out-of-state hospitals and that the Department failed to comply with its procedural requirements "involves a controlling question of law as to which there may be substantial ground for

---

[8]Differences between the Boren Amendment and the 1997 statute that replaced it are spelled out in more detail in *Children's Seashore House v. Waldman* (3d Cir. 1999) 197 F.3d 654, 655-657.

difference of opinion." Accordingly, she found that an immediate appeal from her orders "may materially advance the ultimate termination of this litigation" and granted the state's petition for an interlocutory appeal under 28 United States Code section 1292(b), certified the action for interlocutory appeal, and stayed further district court proceedings pending a decision from the Ninth Circuit Court of Appeals. The Ninth Circuit granted the state's petition for permission to prosecute an interlocutory appeal, and decided the appeal on August 16, 1999. (*Children's Hosp. and Health Center v. Belshe* (9th Cir. 1999) 188 F.3d 1090, cert. den. 530 U.S. 1204 [120 S.Ct. 2197, 147 L.Ed.2d 233].)

In a split opinion, the Ninth Circuit affirmed the judgment of the district court. The majority held that repeal of the Boren Amendment did not render the case moot and the action was not barred by the Eleventh Amendment. Among other things, the majority pointed out that, as authorized by the HCFA, DHS continued to use payment methodologies approved under the Boren Amendment even after its repeal, but "refuses, however, to apply that methodology to its reimbursement of out-of-state hospitals for services they provide to Medi-Cal patients." (*Children's Hosp. and Health Center v. Belshe, supra,* 188 F.3d at p. 1095.) The Boren Amendment applied to out-of-state health care providers, but did not require that same methodology to be used to determine reimbursement rates for both in-state and out-of-state providers. (*Id.* at pp. 1096-1099.) As the majority concluded, DHS "has the option of complying with the Boren Amendment or with the public process provisions of the Balanced Budget Amendment of 1997. It does not have the option of failing to comply with either law. So long as it fails to comply with the Balanced Budget Amendment, it is bound by the Boren Amendment, and *we hold that the Boren Amendment applies to all hospitals, including out-of-state hospitals. We reject [DHS's] contention that the administrative burden of applying the Amendment to out-of-state providers suggests that Congress intended otherwise.*" (*Id.* at p. 1099, italics added.)

### State Proceedings

When respondents initiated the federal action they filed a claim for compensation for past underpayments with the State Board of Control. In 1995, after the claim was denied, respondents commenced the present action in the San Francisco Superior Court. Unlike the federal action, which sought only prospective declaratory relief, the state action sought damages for past underpayments. The state proceeding was necessitated by the fact that while a federal court may find that a state official failed to comply with federal statutory and regulatory requirements, and prospectively enjoin such non-compliance, the Eleventh Amendment bars such a court from imposing a

liability which must be paid from public funds in the state treasury. (*Edelman v. Jordan* (1974) 415 U.S. 651, 663-665 [94 S.Ct. 1347, 1355-1357, 39 L.Ed.2d 662].) Thus, the complaint herein states that the present action is necessary "to protect [respondents'] right to receive retroactive damages for DHS' continuing pattern of unlawful underpayments to out-of-state hospitals in connection with their treatment of Medi-Cal patients since at least October 1992."

Unlike the federal complaint, the complaint in this action makes no mention of the Boren Amendment; it simply alleges generally that appellants' reimbursement scheme violated "federal and state law and the California and U.S. Constitutions." The only state statute referred to in the complaint is subdivision (i).[9] As earlier noted, respondents allege that DHS's application of that statute—which provides that reimbursement for out-of-state hospitals "shall not exceed the current statewide average of contract rates for acute inpatient hospital services"—is invalid, because DHS does not pay out-of-state hospitals the current statewide average of contract rates, but rather the average rate paid in-state hospitals during the previous year, which in an inflationary economy is always less than the current rate.

On December 9, 1998, respondents moved for summary adjudication of two issues. Maintaining Judge Patel's orders were res judicata (the Ninth Circuit had not yet ruled), respondents contended it must therefore be deemed established that, prior to its repeal, the Boren Amendment applied to California's reimbursement scheme and was violated, so that there was no triable issue as to that question. Respondents claimed there was also no triable issue as to the amount of damages to which they were entitled, because federal law mandates that states may only use reimbursement rates that have been approved by the HCFA. Respondents claimed that, because the federal district court invalidated the DHS's current rate-setting methodology, the former HCFA-approved rate-setting methodology remained in

---

[9]However, in its conclusions of law, the trial court states that "California law mandates that [DHS's] treatment of out-of-state hospitals be 'consistent with the requirements of the Federal Social Security Act' (i.e., the Medicaid Act.)," citing Welfare and Institutions Code section 14122. Section 14122 is not mentioned in the complaint because it does not pertain to the reimbursement of out-of-state hospitals. By its own terms, this statute relates to the "care and treatment, or both, of persons eligible for medical assistance . . . by providers in another state in those cases where out-of-state care or treatment is rendered on an emergency basis or is otherwise on the best interests of the person under the circumstances." The regulations implementing this statute (tit. 22, § 51006) make it even more clear that section 14122 relates only to the nature and quality of Medi-Cal patient care.

effect and was the only legally effective rate-setting methodology that could properly be employed for purposes of calculating respondents' damages.[10]

DHS opposed respondents' motion essentially on the grounds Judge Patel's determinations were in the form of interim orders and therefore not binding as res judicata, and that, in any case, Judge Patel found only that DHS failed to comply with the procedural requirements of the Boren Amendment, and never determined the substantive requirements had not been met. On March 9, 1999, respondents' motion for summary adjudication was denied by Judge A. James Robertson II, without a statement of reasons.

On September 13, 1999, about a month after the Ninth Circuit affirmed Judge Patel and remanded the case to her for further proceedings, DHS moved in the superior court to strike portions of the complaint. The motion proceeded on the hypothesis that all of respondents' claims, and at least their constitutional claims, were "dependent upon and inextricably tied" to the assertion that appellants violated a federal statute (42 U.S.C. former § 1396a(a)(13)(A)), because except for the Medicaid Act "there is no requirement that California must pay someone who renders care to a California resident." According to DHS, "[i]t is only the [Medicaid Act] and California's participation in the program authorized by that statute, which compels California to reimburse hospitals in such situations." Relying on the holding in *Alden v. Maine* (1999) 527 U.S. 706 [119 S.Ct. 2240, 144 L.Ed.2d 636] (*Alden*) that the powers delegated to Congress under article I of the United States Constitution do not include the power to subject nonconsenting states to private suits for damages in their own courts unless "there is 'compelling evidence' that the States were required to surrender this power to Congress pursuant to the constitutional design" (*Alden,* at p. 731 [119 S.Ct. at p. 2255]), DHS maintained that respondents' "federally-based causes of action" are barred by the doctrine of sovereign immunity implicit in the Eleventh Amendment, which California has not waived. The motion to strike included the fallback argument that if the trial court believed respondents' state claims were separate and independent of the federal claims, "then, at most, the court should permit [them] to assert only two causes of action: a) alleged violation of the state Constitution, and b) alleged violation of section 14105.15 of the state Welfare and Institutions Code [i.e., subdivision (i)]."

Respondents agreed their damages claims would be barred by the Eleventh Amendment if they derived from a private right of action created by

---

[10]This argument relied on *Exeter Memorial Hosp. Ass'n v. Belshe* (E.D.Cal. 1996) 943 F.Supp. 1239, 1242 ("if HCFA were to disapprove the State plan amendment, the State would be required to reimburse providers under the existing plan and would be required to do so retroactively"). See also *Mass. Fed. of Nursing Homes v. Com. of Mass.* (D.Mass. 1992) 791 F.Supp. 899, 905; *Pinnacle Nursing Home v. Axelrod* (W.D.N.Y. 1989) 719 F.Supp. 1173, 1182-1183.

Congress, but claimed they never alleged any such federal claim in this proceeding and were relying instead on "a variety of State-based legal grounds."

On October 19, 1999, DHS's motion to strike was granted by Judge David Garcia in an order stating, without elaboration, that "all causes of action based on violations of federal law are hereby stricken from the complaint."

On December 10, 1999, DHS moved for summary judgment and, on December 21, 1999, respondents filed a cross-motion seeking the same relief. Judge Garcia denied both motions on January 19, 2000. In denying DHS's motion, Judge Garcia implicitly rejected the contention that respondents were improperly using rulings of the United States District Court and the Ninth Circuit "to mount an indirect attack based on the alleged violation of a federal statute" precluded by *Alden, supra,* 527 U.S. 706.

A bench trial before Judge Robert L. Dondero commenced on July 10, 2000, and lasted 10 days. On December 14, 2000, after posttrial briefing, the trial court issued 26 findings of fact, 32 conclusions of law, and an order. The court concluded that, as alleged in the complaint, DHS violated "state and federal constitutional standards." Deferring to the federal district court ruling, which had by then been affirmed by the Ninth Circuit (*Children's Hosp. and Health Center v. Belshe, supra,* 188 F.3d 1090), the court also concluded that DHS violated the Boren Amendment, indicating that the constitutional and state statutory violations which it found were in part the result of this violation, because the Boren Amendment was in effect during the period for which respondents sought damages. As the federal courts had found that DHS's reimbursement scheme violated the Medicaid Act, the trial court declared that DHS was "collaterally estopped from raising these issues again in that they have already had a full and fair opportunity to litigate them. *Lumpkin v. Jordan* (1996) 49 Cal.App.4th 1223 [57 Cal.Rptr.2d 303]; *Abdallah v. United Savings Bank* (1996) 43 Cal.App.4th 1101 [51 Cal.Rptr.2d 286]."

The trial court found not only that the Medi-Cal patients respondents served were much more costly to treat than Medi-Cal patients typically served by in-state hospitals, but also that DHS's payments to respondents "have *nothing* to do with costs, acuity, or any of the other important factors that are considered for in-state hospitals" (original italics), that respondents were not reimbursed for costs that were "reasonable" and "allowable" under the Medicaid program and for which in-state hospitals were compensated, and that damages should be calculated by subtracting the amount of compensation respondents received from DHS from the amount they would have

received under the reimbursement method prescribed by regulations that had been approved by the HCFA and were used by DHS prior to the enactment of subdivision (i). (Tit. 22, § 51543 (1992).) Using this methodology, the court calculated a net shortfall of $6,088,263 during the period from April 1, 1994 (one year prior to the filing of respondents' claim with the Board of Control) to August 14, 2000, which resulted in reimbursement of 85 percent of the Medi-Cal patient costs respondents incurred during that period. The court also awarded respondents prejudgment interest from August 14, 2000, to the date of judgment calculated at the rate of 10 percent per annum, together with "an award of attorneys fees pursuant to the private attorney general doctrine, in [an] amount to be determined according to proof." (See Code Civ. Proc., § 1021.5.)

After judgment was entered, respondents requested attorney fees in the amount of $1,289,967, which was arrived at by application of a 1.5 multiplier. Rejecting the use of a multiplier, and deducting certain hours claimed by respondents' counsel, the court awarded fees in the amount of $827,145.

This timely appeal followed.

## DISCUSSION

The issues we are asked to address—whether DHS's reimbursement scheme violates the commerce clause, denies equal protection of the law, and infringes rights arising under the Welfare and Institutions Code—present questions of law, as do the related questions of the effect of the federal rulings and the application to this case of the Eleventh Amendment. We review such issues independently. (*Crocker National Bank v. City and County of San Francisco* (1989) 49 Cal.3d 881, 888 [264 Cal.Rptr. 139, 782 P.2d 278].)

## I.

### Eleventh Amendment

█ It is necessary, at the outset, to eliminate some confusion as to application of the Eleventh Amendment. If the trial court correctly concluded that the reimbursement scheme is constitutionally defective or violates state statutes, the state would enjoy no immunity under the Eleventh Amendment, as the violations would not pertain to any congressional mandates. However, as noted, in drawing its conclusions as to the violations of constitutional standards and state statutes, the trial court referred to the determination of the federal district court, affirmed by the Ninth Circuit, that

DHS violated provisions of the federal Medicaid Act pertaining to the compensation of out-of-state hospitals. In the mind of the trial court, the state statutory and constitutional violations were in some unspecified measure the result of the DHS's failure to comply with procedural and substantive requirements of federal law. DHS argues that the trial court's conclusion that the out-of-state rates paid by the Department violate substantive or procedural requirements of federal law "is inconsistent with the earlier ruling by the court striking all causes of action alleging violations of federal law." According to DHS, "[s]ince *Alden* precludes suit in state court based on a violation of a federal statute, plaintiffs should not be permitted to rely on federal court rulings which were based on violations of a federal statute. They cannot do indirectly what they cannot do directly."

Conceiving respondents' constitutional and state statutory claims to be entirely derivative of federal rulings that it violated federal statutes, DHS suggests, though it does not flatly say, that the claims advanced here by respondents are all barred by the doctrine of sovereign immunity articulated in *Alden, supra*, 527 U.S. 706. The trial court correctly rejected this claim.

Prior to *Alden* most Eleventh Amendment cases involved *federal court* actions against a state on the basis of alleged violations of a *federal statute*. *Alden* was an action in state court by state probation officers against the state under the Fair Labor Standards Act of 1938 (29 U.S.C. § 201 et seq.), which purported to authorize private actions against states in *state courts* without their consent. The federal statute with which we are here concerned, the Medicaid Act, contains no such provision. Furthermore, *Alden* involved no claimed violations of state or federal constitutional standards or state law. The present action is one in state court in which unidentified federal statutory causes of action (which respondents insist never existed in the first place) were stricken prior to trial and the trial court, which never independently determined whether any federal statute was violated, found violations only of state and federal constitutional standards and state statutes. The federal statutory violations found by the federal courts relate to the questions whether DHS violated constitutional requirements only because they put the questioned conduct in context; the federal statutes do not, however, provide the legal basis upon which respondents sought and received damages. The Eleventh Amendment only restricts the United States—that is, Congress—from subjecting unconsenting states to lawsuits by citizens of the same or another state. The Medicaid Act was not designed for and does not achieve that proscribed purpose; and the fact that violations of the Medicaid Act may result in or exacerbate violations of constitutional requirements does not in and of itself implicate the doctrine of sovereign immunity. Because the rights asserted by respondents in this action derive from the Constitutions

of this state and nation, not from any private right of action created by Congress, *Alden* does not subject them to the bar of the Eleventh Amendment.

## II.

### *The Commerce Clause*

#### A.

The commerce clause provides that "Congress shall have power . . . [¶] . . . [¶] [t]o regulate commerce . . . among the several states . . . ." ■ "It has long been accepted that the Commerce Clause not only grants Congress the authority to regulate commerce among the States, but also directly limits the power of the States to discriminate against interstate commerce. [Citations.]" (*New Energy Co. of Indiana v. Limbach* (1988) 486 U.S. 269, 273 [108 S.Ct. 1803, 1807, 100 L.Ed.2d 302]; *Gibbons v. Ogden* (1824) 22 U.S. (9 Wheat.) 1, 199-200 [6 L.Ed. 23, 70-71]; *Cooley v. Board of Wardens* (1851) 53 U.S. (12 How.) 299, 319 [13 L.Ed. 996, 1003].)

The United States Supreme Court regularly explains that the implicit or "dormant" limitation on the authority of the states to enact legislation affecting interstate commerce precludes state regulation in certain areas "even absent congressional action." (*CTS Corp. v. Dynamics Corp. of America* (1987) 481 U.S. 69, 87 [107 S.Ct. 1637, 1648, 95 L.Ed.2d 67].) "Though phrased as a grant of regulatory power to Congress, the Clause has long been understood to have a 'negative' aspect that denies the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce. [Citations.] The Framers granted Congress plenary authority over interstate commerce in 'the conviction that in order to succeed, the new Union would have to avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation.' [Citation.] See generally The Federalist No. 42 (J. Madison). 'This principle that our economic unit is the Nation, which alone has the gamut of powers necessary to control of the economy, . . . has as its corollary that the states are not separable economic units.' [Citation.] [¶] Consistent with these principles, we have held that the first step in analyzing any law subject to judicial scrutiny under the negative Commerce Clause is to determine whether it 'regulates evenhandedly with only 'incidental' effects on interstate commerce, or discriminates against interstate commerce.' [Citations.]" (*Oregon Waste Systems, Inc. v. Department of Environmental Quality of Ore.* (1994) 511 U.S. 93, 98-99 [114 S.Ct. 1345, 1349-1350, 128 L.Ed.2d 13].)

The crucial factual determinations the trial court used to support its conclusion that DHS's reimbursement scheme affronted this negative aspect of the commerce clause were that (1) the unweighted average of in-state contract rates for acute inpatient hospital services used by DHS as the basis for reimbursing out-of-state hospitals was 23.8 percent lower than a weighted average would be and the use of an unweighted average compensated respondents nearly $3 million less than they would have received if DHS employed a weighted average; (2) in-state contract rates consistently increased over time and that "use of a rate that is set on December 1, and not adjusted until the next year, inevitably results in out-of-state hospitals being paid less than the 'current' average contract rate," as mandated by state law implementing the Medicaid Act (i.e., subdivision (i)); (3) DHS annually distributes over $2 billion in disproportionate share adjustments to state hospitals, but "has never made a payment of disproportionate share moneys to any out-of-state hospital"; (4) in-state hospitals are entitled to challenge DHS cost determinations administratively and judicially, and DHS is obliged to pay interest on the amounts in-state hospitals are ultimately determined to have been undercompensated, but out-of-state hospitals cannot similarly challenge the adequacy of the compensation they receive; (5) out-of-state hospitals typically serve Medi-Cal patients who are more costly to treat than the Medi-Cal patients typically treated by in-state hospitals; (6) regardless of the financial disincentives in treating Medi-Cal patients, out-of-state hospitals cannot refuse to treat most Medi-Cal patients or transfer them to a California hospital; (7) DHS payments to out-of-state hospitals "have *nothing* to do with costs, acuity, or any of the other important factors that are considered for in-state hospitals" (original italics); (8) during the relevant time period (i.e., April 1, 1994 to August 14, 2000) the expenses incurred by respondent hospitals in treating Medi-Cal patients that were allowable under the principles of cost reimbursement reflected in the Medicaid Act were $22,660,318, but the compensation respondents received for the services they provided such patients during that period was $14,696,955, which was "only sixty-five percent . . . of their 'allowable costs' for the Medi-Cal patients they treated," "leaving a net shortfall based on 'allowable costs' (exclusive of interest) of $7,963,363"; and (9) under the reimbursement system employed by DHS prior to its use of the present system respondents would have received $19,380,433 for the services they provided Medi-Cal patients during the relevant time period, leaving a net shortfall (exclusive of interest) of $4,683,478.[11]

The trial court concluded that the "fundamental dissimilarities" it found between the treatment of in-state and out-of-state hospitals adversely affected the commercial health of out-of-state hospitals. As stated by the court,

---

[11]These findings, and particularly the calculation of damages by a methodology different from the reimbursement scheme prescribed by subdivision (i), imply that the trial court found subdivision (i) unconstitutional, either on its face, as DHS maintains, or as applied, as respondents contend. (See *Brown-Forman Distillers Corp. v. N.Y. Liquor Auth.* (1986) 476

"the evidence shows that [respondents] receive compensation that is not even substantially commensurate with the acute care services they are *compelled* to render for Medi-Cal patients because of Medicaid requirements. Also, [respondents] lack the contracting opportunity and review procedures enjoyed by hospitals in California. Such distinctions are discriminatory and violate the [C]ommerce [C]lause." (Original italics.)

The reimbursement methodology DHS has employed since 1992 affected respondent hospitals far more adversely than most other out-of-state hospitals because of the unusually high number of Medi-Cal patients they each treat. Unlike the vast majority of out-of-state hospitals, respondents are located close to the California border and serve bi-state regions encompassing large rural areas of California in which the level of medical care immediately available is considerably lower than that provided by respondents. Thus, the trial court found respondents "provide the full medical services needed for acute care Medi-Cal patients not just visiting the states of Arizona, Oregon or Nevada, but also those Californians who must avail themselves of [respondents' facilities] . . . because they are the closest major trauma centers *available to Medi-Cal participants residing in California.*" (Original italics.) For example, because large numbers of Medi-Cal beneficiaries residing in California can so easily reach respondent Washoe Medical Center, located in Reno, Nevada, it treats more Medi-Cal patients than any other hospital in the nation located outside California. Moreover, due to the trauma care and other forms of intensive care respondent hospitals provide, they attract "Medi-Cal patients who are much sicker, and therefore require a greater expenditure of resources and costs, than the typical in-state Medi-Cal patient."[12]

---

U.S. 573, 579 [106 S.Ct. 2080, 2084, 90 L.Ed.2d 552] ["When a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests, we have generally struck down the statute without further inquiry."].) Respondents' belief the trial court only found the statute unconstitutional as applied by DHS implies subdivision (i) would create no constitutional problem if the statewide average of contract rates used to calculate the reimbursement of out-of-state hospitals was truly current and weighted to reflect the length of Medi-Cal patient stays. The trial court never indicated whether the statutorily prescribed reimbursement scheme would pass constitutional muster if applied in this manner, and the evidence received by the court does not satisfactorily answer the question.

[12]Hospital administrators express the cost of caring for a given patient population as a "diagnostic related group (DRG) weight." The trial court found that the average DRG weight of Medi-Cal patients treated by respondent hospitals was "much higher" than that of the Medi-Cal patients treated by in-state hospitals with which DHS has contracts. The court found, for example that the DRG weights of Medi-Cal patients treated at respondents Washoe Medical Center and Rogue Valley Medical Center are, respectively, 2.16 and 1.77, more than twice as high as the average DRG weight of contracting in-state hospitals, which is only .87.

The trial court's view that DHS's constitutionally offensive conduct was at least partly attributable to the violations of the Boren Amendment established in the federal proceedings is shown by the quotation in its order of Judge Patel's statement that DHS " 'gathered no information on the costs incurred by out-of-state hospitals and performed no empirical analysis of the effects of the reimbursement scheme on out-of-state hospitals [DHS] therefore failed to provide any basis for a reasonably principled analysis in determining whether the payment rates that it provides to out-of-state hospitals are reasonable and adequate.' " The court also referred to Judge Patel's observation that DSH made no disproportionate share adjustment payments to out-of-state hospitals, nor " 'made any findings as to whether any out-of-state hospitals serve a disproportionate share number of low-income patients with special needs in order to determine whether these hospitals are entitled to receive [disproportionate share] payments.' "

B.

The still evolving jurisprudence of the dormant commerce clause traces the fitful efforts of the United States Supreme Court to establish a satisfactory theoretical basis for a doctrine that is not explicit in the text of the Constitution but may only be inferred.[13] As is widely appreciated, not least of all by members of the United States Supreme Court, our high court has yet to provide a fully coherent theory of the negative dimension of the commerce clause that usefully assists application of the doctrine.[14] ■ Under the Supreme Court's current approach, it appears that "a state law

---

[13]For a concise analysis of the theoretical problems presented by the doctrine of a dormant commerce clause, and the different approaches taken by the Supreme Court over time, see 1 Tribe, American Constitutional Law (3d ed. 2000) sections 6-2 through 6-6, pages 1029-1068.

[14]Chief Justice Rehnquist has observed that "the jurisprudence of the 'negative side' of the commerce clause remains hopelessly confused." (*Kassel v. Consolidated Freightways Corp. of Delaware* (1981) 450 U.S. 662, 706 [101 S.Ct. 1309, 1334, 67 L.Ed.2d 580] (dis. opn. of Rehnquist, C. J.).) In an opinion joined in, by among others, Justice Ginsburg, Justice Scalia agreed that "[t]he Court's negative Commerce Clause jurisprudence has drifted far from its moorings," (*Camps Newfound/Owatonna, Inc. v. Town of Harrison* (1997) 520 U.S. 564, 595 [117 S.Ct. 1590, 1608, 137 L.Ed.2d 852] (dis. opn. of Scalia, J.)), and Justice Thomas, who believes this "failed jurisprudence" is "overbroad and unnecessary," believes it ought to be "abandon[ed]." (*Camps Newfound/Owatonna, Inc. v. Town of Harrison, supra*, at p. 610 [117 S.Ct. at p. 1615] (dis. opn. of Thomas, J.).) While the Supreme Court has "articulated a variety of tests in an attempt to describe the difference between those regulations that the Commerce Clause permits and those regulations that it prohibits" (*CTS Corp. v. Dynamics Corp. of America, supra*, 481 U.S. at p. 87 [107 S.Ct. at p. 1648]), it has provided little clear direction as to the hierarchy of values governing the course that must be taken when policies the various tests advance are in conflict. (See, e.g., Cushman, *Formalism and Realism in Commerce Clause Jurisprudence* (2000) 67 U. Chi. L.Rev. 1089.) Professor Tribe suggests, however, that though it is generally lamentable, the "doctrinal disarray" in this area has the virtue of permitting ad hoc reactions to particular cases that are sometimes warranted. "The plainly manipulable and at times anachronistically metaphysical character of [dormant

must, in the first instance, concern a legitimate state end. Second, even if they have a legitimate aim, state regulations that discriminate against interstate or out-of-state commerce are subject to rigorous scrutiny that approaches *per se* invalidity. Finally, even if a regulation does not discriminate against interstate commerce, it must be struck down if the burden it imposes on interstate commerce is 'clearly excessive in relation to the putative local benefits.' " (1 Tribe, American Constitutional Law, *supra*, § 6-5, pp. 1050-1051, fns. omitted.) By discrimination, the Supreme Court means "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." (*Oregon Waste Systems, Inc. v. Department of Environmental Quality, supra*, 511 U.S. 93, 99 [114 S.Ct. 1345, 1350].)

 DHS's reimbursement scheme obviously discriminates against out-of-state hospitals like respondents' that treat significant numbers of Medi-Cal patients. DHS's argument that the scheme is fair, boils down to no more than the false assertion that paying out-of-state hospitals the average of what DHS pays in-state hospitals with which it has contracts simply means that "out-of-state hospitals will receive less than some California contract hospitals receive and more than others do." This superficial argument ignores findings and substantial evidence that the "cost-mix" of Medi-Cal patients cared for by respondent hospitals is considerably higher than that of the in-state hospitals with which DHS contracts, so that the average rate paid such in-state hospitals is an invidious basis upon which to calculate the level of reimbursement that will fairly compensate respondents.

DHS also ignores the fact that the discrimination found by the trial court relates not just to the undercompensation of out-of-state hospitals, but the denial to them of administrative or judicial processes to challenge the adequacy of reimbursement, which are available to in-state hospitals. As the trial court correctly noted, procedural distinctions providing greater rights to in-state than out-of-state interests have been held to impermissibly burden interstate commerce. *Bendix Autolite Corp. v. Midwesco Enterprises* (1988) 486 U.S. 888 [108 S.Ct. 2218, 100 L.Ed.2d 896] is illustrative. That case involved an Ohio law tolling the statute of limitations for any period that a person or corporation is not "present" in the state. To be present in Ohio, a foreign corporation must appoint an agent for service of process, which operates as consent to the general jurisdiction of Ohio courts. The Supreme Court found that the tolling provision—which "gave Ohio tort plaintiffs unlimited time to sue out-of-state (but not in-state) defendants"

commerce clause] doctrines and the dubious consistency of their complex exceptions suggest that the Supreme Court has preserved them with an eye to their discretionary application in order to prevent what appear to be instances of intolerable local or state interference with interstate markets." (1 Tribe, American Constitutional Law, *supra*, § 6-14, p. 1104.)

(*Reynoldsville Casket Co. v. Hyde* (1995) 514 U.S. 749, 750 [115 S.Ct. 1745, 1747, 131 L.Ed.2d 820])—violated the commerce clause. As the court explained, the Ohio statutory scheme "forces a foreign corporation to choose between exposure to the general jurisdiction of Ohio courts or forfeiture of the limitations defense, remaining subject to suit in Ohio in perpetuity. Requiring a foreign corporation to appoint an agent for service in all cases and to defend itself with reference to all transactions, including those in which it did not have the minimum contacts necessary for supporting personal jurisdiction, is a significant burden." (*Bendix, supra,* at p. 893 [108 S.Ct. at p. 2221].)

 The reimbursement scheme at issue here does not provide out-of-state hospitals the sort of Hobson's choice compelled in *Bendix,* or any choice at all; it simply deprives them of the procedural rights in-state hospitals possess to effectively challenge the adequacy of the compensation they receive for the service they provide. (*Goleta Valley Community Hospital v. Department of Health Services* (1983) 149 Cal.App.3d 1124 [197 Cal.Rptr. 294].)

While differences in the treatment of in-state and out-of-state hospitals that are demonstrably necessary would be constitutionally tolerable, the total indifference of DHS to the true cost of the care provided by out-of-state hospitals which serve significant numbers of Medi-Cal patients, and the denial to such hospitals of any effective way in which to seek and obtain the administrative and judicial relief made available to in-state hospitals, is facially untenable. It must be kept in mind that, for purposes of the dormant commerce clause, the Supreme Court has defined discrimination very expansively. "Any disparity in the treatment of in-state and out-of-state interests—whether businesses, users, or products—constitutes discrimination, even if the disparity is slight. Moreover, the Court has declared that, 'where discrimination is patent, . . . neither a widespread advantage to in-state interests nor a widespread disadvantage to out-of-state competitors need be shown' in order to invalidate the law. Nor does a finding of 'discrimination' necessarily depend on economic analysis." (1 Tribe, American Constitutional Law, *supra,* § 6-6, pp. 1059-1060, fns. omitted.)

 In light of the profound judicial antipathy to state regulations that discriminate against out-of-state economic interests, DHS's scheme must be subjected to the most rigorous judicial scrutiny. As the United States Supreme Court has repeatedly declared: "where simple economic protectionism is effected by state legislation, a virtually *per se* rule of invalidity has been erected." (*Philadelphia v. New Jersey* (1978) 437 U.S. 617, 624 [98 S.Ct. 2531, 2535, 57 L.Ed.2d 475]; accord, *Hughes v. Oklahoma* (1979) 441 U.S.

322, 337 [99 S.Ct. 1727, 1737, 60 L.Ed.2d 250] ["facial discrimination by itself may be a fatal defect"]; *Sporhase v. Nebraska ex rel. Douglas* (1982) 458 U.S. 941, 958 [102 S.Ct. 3456, 3465, 73 L.Ed.2d 1254] ["facially discriminatory legislation" merited " 'strictest scrutiny' "]; *Chemical Waste Management, Inc. v. Hunt* (1992) 504 U.S. 334, 342 [112 S.Ct. 2009, 2014, 119 L.Ed.2d 121] ["Once a state tax is found to discriminate against out-of-state commerce, it is typically struck down without further inquiry."]; *Oregon Waste Systems, Inc. v. Department of Environmental Quality, supra,* 511 U.S. 93, 99 [114 S.Ct. 1345, 1350] ["If a restriction on commerce is discriminatory, it is virtually *per se* invalid."].) The California Supreme Court has of course been equally strict. Speaking for a unanimous court, Chief Justice George has observed that practices which discriminate against interstate commerce must be subjected to "heightened scrutiny." (*Woosley v. State of California* (1992) 3 Cal.4th 758, 783 [13 Cal.Rptr.2d 30, 838 P.2d 758].) Our high court has also refused to indulge discrimination on the ground of "the legitimacy of the state interests that the statute is designed to protect, the degree and scope of the discrimination, and the volume of commerce affected." (*Pacific Merchant Shipping Assn. v. Voss* (1995) 12 Cal.4th 503, 517 [48 Cal.Rptr.2d 582, 907 P.2d 430].) The discrimination prohibited by the dormant commerce clause is simply *any* " 'differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.' " (*Ibid.*)

■ Facially discriminatory state regulations of the sort presented in this case must be stricken "unless the discrimination is demonstrably justified by a valid factor unrelated to economic protectionism." (*New Energy Co. of Indiana v. Limbach, supra,* 486 U.S. 269, 274 [108 S.Ct. 1803, 1808].) ■ DHS's defense to respondents' commerce clause claim does not genuinely rest on any such justification.[15] Its chief defense lies instead in the unusual contention that its reimbursement scheme cannot offend the commerce clause because it does not relate to an article of commerce.

Allowing that there is an interstate aspect to this case, DHS insists that, unlike the commerce clause cases relied upon by respondents and by the

---

[15]The only justification DHS offers for the disparate compensation of in-state and out-of-state hospitals is that it is impossible, as a practical matter, to enter into a cost sensitive contract with "every hospital across the nation," most of which are distant and rarely treat Med-Cal patients. However, DHS does not explain why it cannot either contract with the relatively few large hospitals in nearby regions of adjacent states that treat significant numbers of such patients (if they are willing to make their cost figures available and submit to audits), or voluntarily comply with federally approved procedures for reimbursing out-of-state hospitals that require the reasonable costs of such hospitals to be taken into account, which the trial court ordered DHS to comply with. Nor has DHS offered any explanation why large out-of-state hospitals that treat significant numbers of Medi-Cal patients and are willing to submit to the authority of DHS and the jurisdiction of California courts cannot be allowed administrative and judicial processes to challenge the adequacy of the compensation they receive.

trial court, in which there was competition between the in-state and out-of-state enterprises whose economic interests were at stake,[16] there is no competition between in-state and out-of-state hospitals relating to the treatment of Medi-Cal patients and the challenged regulation therefore does not affect the flow of commerce. DHS emphasizes that respondent hospitals do not send their doctors into California to do business, but simply provide treatment in their states to California residents who happen to be there. According to DHS, when respondents provide such care and are paid by California, "there is no competitive consequence. California hospitals do not achieve an advantage over [respondent hospitals] as a consequence of the latter's being paid less than some California hospitals might be paid for the same services." DHS also emphasizes that, because hospitals have a legal obligation to provide services to persons whose health care is subsidized under the Medicare program, treatment decisions are not made on the basis of competitive considerations. For this reason, DHS argues, "all hospitals in all states are on an equal footing. They all must treat out-of-state residents. Some may receive more money than others but there is no law which requires parity or any uniform payment system and, in any event, differing reimbursement rates have no effect on the hospitals' statutory obligation to render treatment." We are not impressed with this argument.

To begin with, the Supreme Court's definition of interstate commerce is notably capacious. ■ "All objects of interstate trade merit commerce clause protection; none is excluded by definition at the outset." (*Philadelphia v. New Jersey, supra,* 437 U.S. at p. 622 [98 S.Ct. at p. 2534].) The provision of services to residents of other states is no less an object of interstate commerce than the sale of goods. (See, e.g., *Camps Newfound/Owatonna, Inc. v. Town of Harrison, supra,* 520 U.S. 564.)

■ The flaw in DHS's argument lies in the artificiality of its definition of the commerce at issue in this case. It is true that, unlike most other services that are offered for a fee, the service of treating Medi-Cal patients (which the recipient of care cannot afford and the government does not fully subsidize) is by its very nature unprofitable, and hospitals therefore have no incentive to compete for such patients. However, while there is no competition between in-state and out-of-state hospitals for Medi-Cal patients, beneficiaries of the Medi-Cal program are not the only Californians who may obtain needed medical assistance from out-of-state hospitals, particularly those located in nearby communities in adjacent states. Respondents

---

[16]*Oregon Waste Systems, Inc. v. Department of Environmental Quality, supra,* 511 U.S. 93; *Chemical Waste Management, Inc. v. Hunt, supra,* 504 U.S. 334; *Philadelphia v. New Jersey, supra,* 437 U.S. 617; *Hunt v. Washington Apple Advertising Comm'n* (1977) 432 U.S. 333 [97 S.Ct. 2434, 53 L.Ed.2d 383].

and undoubtedly other out-of-state hospitals located close to our state line serve not just Medi-Cal patients but many other California residents in need of care who are able to pay their own way or whose health insurance more fully compensates health care providers. With respect to this universe of patients there is competition between and among in-state and out-of-state hospitals located in the same region. Respondents' commerce clause claim is built on the theory that the undercompensation they receive from DHS regarding a class of patients they cannot legally refuse to serve places them at a disadvantage against nearby in-state hospitals with which they compete for profitable business. The only way out-of-state hospitals can recover the inordinately high unreimbursed costs they incur by treating Medi-Cal patients is either to charge other patients more than the California hospitals with which they compete need to charge in order to cover their costs or to accept lower profit margins than the in-state competitors they have relieved of the need to serve unprofitable Medi-Cal patients. Without ever explicitly addressing the issue, DHS untenably assumes California hospitals do not compete with out-of-state hospitals for other patients, and ignores the manner in which its reimbursement scheme places out-of-state hospitals at a disadvantage with respect to that competition. In short, the article of commerce with which we are here concerned is not the provision of hospital care to Medi-Cal patients, as DHS maintains, but the provision of such care to *all* persons to whom a hospital can make it available. The evidence supports the trial court determination that DHS's reimbursement scheme adversely affected respondents' overall commercial health, to the advantage of the in-state hospitals with which they compete, and it is in that way that the scheme burdens the interstate flow of the commercial services respondents provide.

We are not persuaded by DHS's contention that the revenues out-of-state hospitals receive from treating Medi-Cal patients are such a small portion of their total revenues that the undercompensation they receive for this service does not materially affect their ability to compete with in-state hospitals. Even if Medi-Cal patients provide a small portion of the revenues of respondent hospitals, it must be remembered that even a slight disparity in the treatment of in-state and out-of-state interests may offend the dormant commerce clause. For example, in *Oregon Waste Systems, Inc. v. Department of Environmental Quality, supra,* 511 U.S. 93, the Supreme Court found that a $2.25 per ton surcharge on out-of-state waste impermissibly burdened interstate commerce even though it amounted to an increase of only 14 cents per week for the average user. The court stated that its precedents "clearly establish that the degree of a differential burden or charge on interstate commerce 'measures only the *extent* of the discrimination' and 'is of no relevance to the determination whether a State has discriminated against

interstate commerce.' " (*Id.* at p. 100, fn. 4 [114 S.Ct. at p. 1350], original italics, quoting *Wyoming v. Oklahoma* (1992) 502 U.S. 437, 455 [112 S.Ct. 789, 801 117 L.Ed.2d 1].)

DHS suggests that any unfairness that may result from its reimbursement scheme is or can be ameliorated by other states, which may reciprocally undercompensate California hospitals for services to Medicaid patients from their states. This argument is unacceptable, even indulging the unjustified assumptions that reciprocal discrimination against California could legally be achieved, and, if so, would be desirable as a matter of policy. In *New Energy Co. of Indiana v. Limbach, supra,* 486 U.S. 269, the Supreme Court invalidated an Ohio law providing a tax credit against the Ohio motor fuel sales tax for ethanol produced in Ohio or in a state granting similar tax advantages to ethanol produced in Ohio. New Energy Company manufactured ethanol in Indiana, a state that provided no such tax relief. Ohio defended its statute on the ground, among others, that it simply encouraged other states to provide ethanol credits for motor fuel taxes, and therefore did not burden but actually promoted interstate commerce in an environmentally sound product. The Supreme Court rejected this justification, quoting its earlier declaration that a state " 'may not use the threat of economic isolation as a weapon to force sister States to enter into even a desirable reciprocity agreement.' " (*Id.* at p. 274 [108 S.Ct. at p. 1808], quoting *A & P Tea Co. v. Cottrell* (1976) 424 U.S. 366 [96 S.Ct. 923, 47 L.Ed.2d 55].)

DHS argues, finally, that even if its reimbursement scheme burdens interstate commerce, the so-called "market participation exception" exempts its conduct from prohibitions of the dormant commerce clause that might otherwise apply. We disagree.

■ As the Supreme Court has explained, "[n]othing in the purposes animating the commerce clause prohibits a State, in the absence of congressional action, from participating in the market and exercising the right to favor its own citizens over others." (*Hughes v. Alexandria Scrap Corp.* (1976) 426 U.S. 794, 810 [96 S.Ct. 2488, 2498, 49 L.Ed.2d 220].) Thus, "if a State is acting as a market participant, rather than as a market regulator, the dormant commerce clause places no limitation on its activities." (*South-Central Timber Dev. v. Wunnicke* (1984) 467 U.S. 82, 93 [104 S.Ct. 2237, 2243, 81 L.Ed.2d 71]; accord, *Wyoming v. Oklahoma, supra,* 502 U.S. 437, 458 [112 S.Ct. 789, 802]; *Reeves, Inc. v. Stake* (1980) 447 U.S. 429, 439 [100 S.Ct. 2271, 2278-2279, 65 L.Ed.2d 244]. Application of this principle invariably turns upon whether the state conduct at issue truly constitutes participation in an open private market or is instead simply a form of governmental regulation. "When a state engages in market 'participation'—

that is, when it enters the open market as a buyer or seller on the same footing as private parties—there is less danger that the state's activity will interfere with Congress's plenary power to regulate the market. As the Court has explained, the Commerce Clause 'restricts "state taxes and regulatory measures impeding free private trade in the national marketplace," but "[there] is no indication of a constitutional plan to limit the ability of the States themselves to operate freely in the free market." ' [Citations.] Pursuant to this doctrine—the 'market participant' exception to the dormant Commerce Clause—states are permitted to enter a market with the same freedoms and subject to the same restrictions as a private party. To the extent that a state is acting as a market participant, it may pick and choose its business partners, its terms of doing business, and its business goals—just as if it were a private party." (*SSC Corp. v. Town of Smithtown* (2d Cir. 1995) 66 F.3d 502, 510, fn. omitted.)

 DHS claims the market participation exception applies because the State of California "participates in the purchase of medical services for those of its residents who require acute inpatient care when out-of-state." The defects in this argument are readily apparent. First, the state is not itself a consumer of the service in question, nor does it pick and choose service providers. Discharging conventional regulatory responsibilities imposed on it by state and federal law, the state, through DHS, merely reimburses those service providers selected by Medi-Cal recipients in need of medical care. The level of reimbursement DHS allows is clearly not responsive to market forces. Moreover, as DHS itself correctly points out in a different connection, there is no genuine private market regarding the delivery of care to Medi-Cal patients in which the state could participate. Though the treatment of Medi-Cal patients is less costly for in-state than out-of-state hospitals, it is in both cases inherently unprofitable; hospitals serve Medi-Cal patients only because they cannot legally refuse to do so. In sum, when it determines the level of compensation hospitals are entitled to receive for the treatment of Medi-Cal patients, DHS is not participating in an open market but simply carrying out a traditional state regulatory responsibility. The market participation exception therefore does not apply.

The trial court finding that DHS's discriminatory reimbursement scheme came within the negative sweep of the commerce clause was correct.

### III.

### The Equal Protection Clause

The equal protection clause of the Fourteenth Amendment commands that no state shall "deny to any person within its jurisdiction the equal protection

of the laws." (U.S. Const., 14th Amend., § 1.) The provisions of the California Constitution guaranteeing equal protection, set forth in article I, section 7, are "substantially the equivalent of the equal protection clause of the Fourteenth Amendment . . . ." (*Department of Mental Hygiene v. Kirchner* (1965) 62 Cal.2d 586, 588 [43 Cal.Rptr. 329, 400 P.2d 321].)

■ Where, as here, the differential treatment of in-state and out-of-state enterprises does not relate to any fundamental interests, such as the right to vote, or suspect classifications, such as race or sexual orientation, the question is whether there is a rational basis for the different treatment. " '[W]hatever the extent of a State's authority to exclude foreign corporations from doing business within its boundaries, that authority does not justify imposition of more onerous taxes or other burdens on foreign corporations than those imposed on domestic corporations, unless the discrimination between foreign and domestic corporations bears a rational relation to a legitimate state purpose.' " (*Metropolitan Life Ins. Co. v. Ward* (1985) 470 U.S. 869, 875 [105 S.Ct. 1676, 1680, 84 L.Ed.2d 751].)

■ Discriminatory state conduct that violates the commerce clause does not necessarily offend the equal protection clause. (*Bendix Autolite Corp. v. Midwesco Enterprises, Inc., supra*, 486 U.S. 888, 894 [108 S.Ct. 2218, 2222].) ■ Moreover, as the seminal opinion of *Dandridge v. Williams* (1970) 397 U.S. 471 [90 S.Ct. 1153, 25 L.Ed.2d 491] makes clear, "[i]n the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.' [Citation.] 'The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical it may be, and unscientific.' [Citation.] 'A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it.' [Citation.]" (*Id.* at p. 485 [90 S.Ct. at p. 1161]; *Hansen v. City of Buenaventura* (1986) 42 Cal.3d 1172, 1190 [233 Cal.Rptr. 22, 729 P.2d 186].)

■ After observing that DHS failed to present any such governmental interest, and that "budgetary interests" would not suffice (citing *AMISUB (PSL), Inc. v. Colorado Dept. of Social Services* (10th Cir. 1989) 879 F.2d 789, 800-801, cert. den. 496 U.S. 935 [110 S.Ct. 3212, 110 L.Ed.2d 660]; *Tallahassee Memorial Regional Medical Center v. Cook* (11th Cir. 1997) 109 F.3d 693, 704), the trial court found that DHS's differential treatment of in-state and out-of-state hospitals bore no rational relationship to any legitimate state purpose.

DHS contests this ruling not just by renewing its contention that its reimbursement scheme is fair and rational, but also by claiming that, as a practical matter, there is no workable alternative. Respondents point out that the argument that basing their reimbursement on the average rate paid in-state hospitals with which DHS has contracts (as prescribed by subdivision (i)) is fair and rational cannot be squared with the determinations of the federal district court that DHS "gathered no information on the costs incurred by out-of-state hospitals and performed no empirical analysis of the effects of the reimbursement scheme on out-of-state hospitals," and claim DHS is therefore collaterally estopped from arguing that the scheme is reasonable. (Italics omitted.) We feel it unnecessary to decide the extent to which DHS may be collaterally estopped from defending its scheme because the trial court independently addressed the defense and found it wanting, as we have. Moreover, DHS's claim that its scheme is rational because no workable alternative exists appears never to have been raised in the federal proceedings.

DHS sums up this argument in its opening brief as follows: "By definition, [out-of-state hospitals] are outside the borders of this state and, in most instances, quite distant. They are not subject to California jurisdiction; they are beyond the control of the California Legislature and the reach of regulations enacted by DHS. Moreover, the vast majority of them treat California residents only on an episodic basis. Whereas . . . the state can contract with in-state hospitals to treat California residents, the state can hardly contract with the 7500 hospitals across the nation which conceivably would have occasion to treat a California resident. And whereas the non-contract hospitals in California submit annual cost data to the state, are subjected to peer grouping, quality of care review, review of staffing levels, and state audits, manifestly these procedures cannot be applied to hospitals across the country. [¶] Thus, it is clear that out-of-state hospitals cannot be paid based on the methodologies used to pay California hospitals."

It is quite true that "where a group possesses 'distinguishing characteristics relevant to interests the State has the authority to implement,' a State's decision to act on the basis of those differences does not give rise to a constitutional violation." (*Board of Trustees of Univ. of Ala. v. Garrett* (2001) 531 U.S. 356, 366-367 [121 S.Ct. 955, 963, 148 L.Ed.2d 866].) However, the characteristics of the "7500 hospitals across the nation which conceivably would have occasion to treat California residents" that DHS emphasizes most heavily are not attributable to respondents and other similarly situated out-of-state hospitals. As earlier explained, respondent hospitals are each located in areas of adjacent states easily accessible to many California residents. The Californians they serve include not just a few travelers who

appear on an episodic basis but significant numbers of Medi-Cal beneficiaries residing in the far northern and eastern reaches of our state, which do not possess many large medical facilities able to provide the high level of intensive care that can be obtained from respondents' facilities, which are relatively close. As the trial court found, respondents "provide the full medical services needed for acute care Medi-Cal patients not just visiting the states of Arizona, Oregon or Nevada, but also those Californians who must avail themselves of [respondents'] facilities . . . because they are the closest major trauma centers *available to Medi-Cal participants residing in California.*" (Original italics.)

DHS's argument that there is no workable alternative to the reimbursement scheme it began using in 1992 consists of little more than an explanation of the practical impossibility of treating out-of-state hospitals in exactly the same manner as in-state hospitals. The argument posits a straw man. Respondents have never proposed that they be treated in exactly the same manner as in-state hospitals. All they sought, and all the trial court ordered, was that DHS revert to the reimbursement scheme prescribed by DHS regulations in effect prior to the enactment of subdivision (i) in 1992 (tit. 22, former § 51543 (1992)), which had been approved by the HCFA and which DHS employed for many years without complaint.[17] The prior regulation allowed for five different reimbursement methodologies, depending upon the availability of specified information. The trial court found respondents presented adequate data supporting use of the first methodology set forth in the regulation, which provided for compensating an out-of-state hospital "a percentage of allowable billed charges" based on "[t]he average percentage of charges, up to a maximum of 100 percent, which is paid to the hospital by that hospital's state." (Tit. 22, former § 51543, subd. (a)(1).) Neither in the trial court nor in this court has DHS shown that use of the reimbursement scheme it previously employed would be unduly burdensome in any way or unfair to the State of California.

DHS has failed to demonstrate that its differential treatment of respondent hospitals on the basis of their location out of state is rationally related to a legitimate governmental purpose. Its conduct therefore infringes respondents' rights under the equal protection clauses of the state and federal Constitutions.

---

[17]Use of the prior reimbursement regulation was sought by respondents and ordered by the court on the basis of federal case law indicating that invalidation of a current state scheme for the reimbursement of Medicaid providers triggers imposition of a prior federally approved scheme. (*Exeter Memorial Hosp. Ass'n v. Belshe* (E.D.Cal. 1996) 943 F.Supp. 1239, 1242; see also *Mass. Fed. of Nursing Homes v. Com. of Mass.* (D.Mass. 1992) 791 F.Supp. 899, 905; *Pinnacle Nursing Home v. Axelrod, supra,* 719 F.Supp. 1173, 1182-1183.)

## IV.

*Respondents Are Entitled to Prejudgment Interest but
Only at the Rate of 7 Percent*

Section 3287, subdivision (a), of the Civil Code states in material part: "Every person who is entitled to recover damages *certain, or capable of being made certain by calculation,* and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day, except during such time as the debtor is prevented by law, or by the act of the creditor from paying the debt. . . ." (Italics added.)

 DHS contends the award of prejudgment interest was improper because the damages to which respondents were entitled were never certain or capable of being made certain. It argues that the uncertainty of the amount of damages respondents had a right to recover is shown not only by the fact that respondents presented different damage models from which they asked the court to choose, but also by the disparity between the amount of damages sought ("$20 million or according to proof") and that awarded. In reply to this argument, respondents rely upon cases in which plaintiffs were awarded prejudgment interest even though they had proposed different measures of damages. (*Shell Oil Co. v. National Union Fire Ins. Co.* (1996) 44 Cal.App.4th 1633 [52 Cal.Rptr.2d 580] (*Shell Oil Co.*); *Fireman's Fund Ins. Co. v. Allstate Ins. Co.* (1991) 234 Cal.App.3d 1154 [286 Cal.Rptr. 146].)

In *Shell Oil Co., supra,* 44 Cal.App.4th 1633 the plaintiff oil company was awarded damages for breach of a liability insurance policy. The trial court, sitting without a jury, found that the defendant insurance company, National, had provided coverage for an accident that resulted from Shell's sole negligence, and that National did not fully discharge its contractual duties by paying its policy limit in settlement for a coinsured, and awarded Shell prejudgment interest on the $500,000 damages it received for National's breach of coverage duties. The Court of Appeal affirmed the trial court in all respects. As to prejudgment interest, the appellate court acknowledged Shell had advanced alternative theories of liability, but pointed out that the "alternative theories required only the court's legal determination of which was appropriate; the amount of damages would thereby be fixed." (*Shell Oil Co., supra,* at p. 1651.) The court observed that the situation was comparable to that in *Hartford Accident & Indemnity Co. v. Sequoia Ins. Co.* (1989) 211 Cal.App.3d 1285 [260 Cal.Rptr. 190], "in which the overall responsibility of an insurer was in dispute, and the amount recoverable from it depended on how the court assigned priorities among it and two other insurers. There, as here, 'the amount of damages under either formula was readily ascertainable

by mathematical calculation' (*id.* at p. 1307), and prejudgment interest was appropriate." (*Shell Oil Co., supra,* 44 Cal.App.4th at p. 1651.) *Fireman's Fund Ins. Co. v. Allstate Ins. Co., supra,* 234 Cal.App.3d 1154 also involved a situation in which the prevailing party advanced alternative theories of liability. Affirming an award of prejudgment interest, the Court of Appeal observed that "[w]hatever uncertainty about the extent of Fireman's liability may have been fostered by the alternative theories Fireman's proposed, we do not view that uncertainty as an impediment to the award of prejudgment interest. While Fireman's proposed a general formula based on four inapt theories of lesser liability, it also suggested a specific amount due Allstate and Northbrook under each theory. Through it all, the extent of Fireman's exposure remained purely a question of law. Thus, the amounts proposed under Fireman's theories or the amounts legally compelled by section 3634 were readily ascertainable." (*Id.* at p. 1174, italics omitted.)

In the present case, like the three just briefly described, respondents' alternative theories as to the manner in which damages should be calculated were all tethered to legal theories. Although the complaint did pray for damages of "$20 million or according to proof," respondents made it clear long before trial, at the time they sought summary judgment, that they sought a specific amount of damages and that it was the product of applying a specific government-approved formula. As noted, the method of calculating damages respondents advanced, and the one adopted by the trial court, was retroactive application of the reimbursement methodology approved by HCFA and used by DHS prior to the 1992 enactment of subdivision (i). This contention was based on law, not disputed evidence. Respondents emphasized that federal courts consistently mandated retroactive reimbursement pursuant to a previous HCFA approved state reimbursement methodology after invalidating a current scheme (*Exeter Memorial Hospital Ass'n v. Belshe, supra,* 943 F.Supp. 1239, 1242, affd. (1998) 145 F.3d 1106; *Pinnacle Nursing Home v. Axelrod, supra,* 719 F.Supp. 1173, revd. in part on other grounds, 928 F.2d 1306; *Mass. Fed. of Nursing Homes v. Com. of Mass., supra,* 791 F.Supp. 899), and vigorously urged the trial court to follow suit. It was only in the event (which did not materialize) that the court decided that the previous HCFA approved reimbursement scheme should *not* be judicially imposed that respondents urged they should at least be provided a right to seek administrative adjustments of prior reimbursements pursuant to a regulation permitting such adjustments (tit. 22, § 51543, subd. (b)) which out-of-state hospitals had been prevented from using by the enactment of subdivision (i), which did not allow for adjustments. Respondents never proposed a specific amount of damages they felt they were entitled to recover in this manner. If this route to recovery had been available, respondents presumably would have sought adjustments based on the same HCFA-approved formula they persuaded the trial court to adopt.

The only other theory of recovery respondents advanced was in connection with their quantum meruit claim, which sought an amount *over and above* that to which they claimed entitlement under the previous reimbursement scheme approved by HCFA. Under this legal theory, respondents sought to recover *all* of the costs they actually incurred, the amount of which was never factually disputed, minus the amounts DHS had paid, which was also undisputed. The trial court rejected this claim because it did not feel respondents were as a matter of law entitled to reimbursement of all of the costs incurred in the treatment of Medi-Cal patients.

■■■ " 'The test for recovery of prejudgment interest under [Civil Code] section 3287, subdivision (a) is whether *defendant* actually know[s] the amount owed or from reasonably available information could the defendant have computed that amount. [Citation.]' (*Cassinos* v. *Union Oil Co.* [(1993)] 14 Cal.App.4th [1770,] 1789 [18 Cal.Rptr.2d 574], original italics; *Hartford Accident & Indemnity Co.* v. *Sequoia Ins. Co.* (1989) 211 Cal.App.3d 1285, 1307 [260 Cal.Rptr. 190]; *Chesapeake Industries, Inc.* v. *Togova Enterprises, Inc.* (1983) 149 Cal.App.3d 901, 907 [197 Cal.Rptr. 348].) 'The statute . . . does not authorize prejudgment interest where the amount of damage, as opposed to the determination of liability, "depends upon a judicial determination based upon conflicting evidence and it is not ascertainable from truthful data supplied by the claimant to his debtor." [Citations.]' (*Fireman's Fund Insurance Co.* v. *Allstate Ins. Co.,*[*supra,*] 234 Cal.App.3d 1154, 1173 . . . .) Thus, where the amount of damages cannot be resolved except by verdict or judgment, prejudgment interest is not appropriate. (*Stein* v. *Southern Cal. Edison Co.* [(1992)] 7 Cal.App.4th [565,] 573 [8 Cal.Rptr.2d 907].)" (*Wisper Corp.* v. *California Commerce Bank* (1996) 49 Cal.App.4th 948, 960 [57 Cal.Rptr.2d 141].)

■■■ Applying the foregoing principles to the facts before us, it is clear the amount of damages owed respondent hospitals by DHS was sufficiently calculable prior to trial. In reality, respondents put forth only two methods of calculating damages. The proposed methods did not conflict, because use of the second (quantum meruit) would only have augmented the amount produced by the first (the previous HCFA-approved methodology), and neither method required reliance on disputed cost figures. The damages calculated by the court using the previous HCFA-approved methodology could have been computed by DHS from the same information used by the court, which was available to DHS at all material times. In short, the requirement that the damages be "certain" or "capable of being made certain . . . ." (Civ. Code, § 3287) in order for prejudgment interest to be awarded was satisfied in this case.

However, while the award of prejudgment interest was proper, the 10 percent rate of interest set by the court was excessive. The court appears to

have fixed the rate of interest at 10 percent on the basis of subdivision (b) of Civil Code section 3289, which as material provides that "[i]f a contract entered into after January 1, 1986, does not stipulate a legal rate of interest, the obligation shall bear interest at a rate of 10 percent per annum after a breach." Respondent hospitals agree that, as their right to reimbursement from DHS is not based on contract, the rate of prejudgment interest should be that fixed by article XV, section 1 of the California Constitution; namely, 7 percent per annum.

## V.

### *Respondents Are Entitled to the Attorney Fees Awarded by the Court*

In its order directing the payment of damages and prejudgment interest, the court also declared that respondents "are entitled to an award of attorneys fees pursuant to the private attorney general doctrine [(Code Civ. Proc., § 1021.5)], in the amount to be determined according to proof." In addition to their costs of $34,620, respondents sought an award of attorney fees in the amount of $1,270,967, which necessitated application of a 1.5 multiplier to a proposed lodestar figure of $859,977.79. In an order filed on March 29, 2001, the trial court found that respondents were entitled to attorney fees under the private attorney general theory codified in Code of Civil Procedure section 1021.5 (section 1021.5). After finding that $380 per hour was a reasonable rate, and deducting 86.40 hours from the 2,223.30 hours submitted by respondents' counsel, the trial court set a lodestar amount of $827,145.79. The court refused to enhance this figure with a multiplier because it concluded that the lodestar amount was sufficient. Approximately one-third of the hours compensated by the award were devoted to the related federal proceedings.

On appeal DHS argues that (1) respondents are not entitled to any attorney fees because they cannot satisfy the requisites of section 1021.5; but even if they are deemed to have satisfied the statute, (2) they are not entitled to fees incurred in the federal proceedings; and (3) the hourly rates allowed by the trial court are excessive, as are the amount of hours for which respondents were compensated. We believe DHS waived objection to the trial court's determination that respondents were entitled to an award of attorney fees under section 1021.5, and that it may on this appeal challenge only the amount of fees awarded.

### A.

In its order of December 14, 2000, the trial court stated its intention to award fees pursuant to the private attorney general theory codified in section

1021.5. Accordingly, the last sentence of the judgment, which issued on December 20, 2000, stated that "the Plaintiff Hospitals are entitled to an award of attorneys fees pursuant to the private attorney general doctrine and costs, in amounts to be determined according to proof." Respondents served DHS with written notice of entry of judgment on December 28, 2000. On February 14, 2001, at the hearing on attorney fees, counsel for respondents pointed out to the court that if DHS believed the court had used an incorrect or erroneous basis in determining that respondents were entitled to an attorney fee award, its remedy was to file a motion under Code of Civil Procedure section 663. Because DHS never filed such a motion, which was required by Code of Civil Procedure section 663a to be filed within 15 days of service of written notice of entry of judgment, respondents maintained it was too late to do so. The trial court agreed. Its order dated March 29, 2001, setting the amount of attorney fees, states that DHS had until January 12, 2001, to move to vacate the decision to award fees but did not oppose the award until February 2, 2001. Declaring that "[r]elief cannot be granted for the failure to take a jurisdictional step, such as the filing of a timely motion to vacate," the court concluded that "the defendants are jurisdictionally barred from challenging the Court's award of attorneys' fees."

■■■ On appeal, in a supplemental letter brief requested by this court, DHS takes the position that the trial court's declaration that respondents were entitled to attorney fees was made prior to the time respondents filed their formal written motion for fees and that an award under section 1021.5 may only be made "upon motion," citing *Hospital Systems Inc. v. Office of Statewide Health etc. Development* (1994) 25 Cal.App.4th 1686, 1691 [30 Cal.Rptr.2d 922]. According to DHS, the inclusion of an attorney fee award in the judgment was therefore "beyond the court's jurisdiction."

DHS has "doubly waived" the right to present this argument on appeal. (*Campos v. Anderson* (1997) 57 Cal.App.4th 784, 794 [67 Cal.Rptr.2d 350].) First, the theory was never presented to the trial court, either in a motion to vacate pursuant to Code of Civil Procedure section 663, in the memorandum in opposition to the award of attorney fees DHS submitted to the trial court, orally at the postjudgment hearing conducted by the court on the issue of fees, or in any other way. Had it been presented, and had the court agreed, the problem could easily have been rectified, which may be the reason the argument was never raised. "An appellate court will not consider procedural defects or erroneous rulings where an objection could have been, but was not, raised in the court below." (*Steven W. v. Matthew S.* (1995) 33 Cal.App.4th 1108, 1117 [39 Cal.Rptr.2d 535].) It is unfair to the trial judge and to the adverse party to take advantage of an alleged error on appeal where it could easily have been corrected at trial. (*Doers v. Golden Gate*

*Bridge etc. Dist.* (1979) 23 Cal.3d 180, 184, fn. 1 [151 Cal.Rptr. 837, 588 P.2d 1261]; accord, *Planned Protective Services, Inc. v. Gorton* (1988) 200 Cal.App.3d 1, 12-13 [245 Cal.Rptr. 790] [applying the rule in an appeal from the recovery of attorney fees].)

Furthermore, the issue was never raised in the opening and reply briefs DHS filed in this court. Points raised for the first time in a reply brief ordinarily need not be considered (*Heiner v. Kmart Corp.* (2000) 84 Cal.App.4th 335, 351 [100 Cal.Rptr.2d 854]; *Shade Foods Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78 Cal.App.4th 847, 894, fn. 10 [93 Cal.Rptr.2d 364]), and such abstention is even more appropriate where, as here, the issue is not even mentioned in the reply brief but only in a supplemental postbriefing submission requested by the court. (*San Mateo County Coastal Landowners' Assn. v. County of San Mateo* (1995) 38 Cal.App.4th 523, 559, fn. 28 [45 Cal.Rptr.2d 117].)

DHS's claims that the amount of fees awarded is excessive—because the hourly rates allowed were excessive and fees incurred in the federal proceedings should not have been allowed—are cognizable on appeal, however, as the amount was not set forth in the judgment but in a postjudgment order that issued after briefing and oral argument, and this matter was raised by DHS at trial and in its opening brief in this court.

### B.

With respect to the *amount* of fees awarded, there is no question our review must be highly deferential to the views of the trial court. (*Press v. Lucky Stores, Inc.* (1983) 34 Cal.3d 311, 321-322 [193 Cal.Rptr. 900, 667 P.2d 704].) As our high court has repeatedly stated, " ' "[t]he 'experienced trial judge is the best judge of the value of professional services rendered in his [or her] court, and while his judgment is of course subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong'—meaning that it abused its discretion." ' " (*Thayer v. Wells Fargo Bank N.A.* (2001) 92 Cal.App.4th 819, 832 [112 Cal.Rptr.2d 284], quoting *PLCM Group v. Drexler* (2000) 22 Cal.4th 1084, 1095 [95 Cal.Rptr.2d 198, 997 P.2d 511], quoting *Serrano v. Priest* (1977) 20 Cal.3d 25, 49 [141 Cal.Rptr. 315, 569 P.2d 1303] and citing *Fed-Mart Corp. v. Pell Enterprises, Inc.* (1980) 111 Cal.App.3d 215, 228 [168 Cal.Rptr. 525] [an appellate court will interfere with a determination of reasonable attorney fees "only where there has been a manifest abuse of discretion"].)

### 1.

DHS's contention that the amount of fees awarded was excessive consists in part of the claim that respondents were not entitled to compensation for time spent by their counsel on the federal case. According to DHS,

respondents' victory in this case "in no way hinged on the federal action." DHS's plangent assertions that the federal rulings "have absolutely no significance" to the present litigation are unacceptable. To be sure, the dispositive federal rulings that DHS violated the Medicaid Act collaterally estopped DHS from relitigating that precise issue in state court, but it does not follow that the statutory violations found by the federal courts are unrelated to the constitutional questions litigated in this action. As earlier explained, the trial court's conclusion that DHS's reimbursement scheme offended the dormant commerce clause rested in part on Judge Patel's determinations, affirmed by the Ninth Circuit, that DHS violated the Medicaid Act by gathering no information on the costs incurred by out-of-state hospitals, performing no empirical analysis of the effects of its reimbursement scheme on out-of-state hospitals, and failing to provide any other basis for a principled analysis as to whether its reimbursement of such hospitals was reasonable and adequate. The trial court also relied on Judge Patel's finding that DHS made no disproportionate share adjustment payments to out-of-state hospitals, nor undertook any inquiry as to whether they were entitled to such payments. If the federal courts had not previously determined that DHS treatment of out-of-state hospitals did not comply with the federal statutory scheme, the superior court would almost certainly have had to address that complex question, as DHS would surely have answered respondents' constitutional claims by arguing that the challenged conduct was fully consistent with the mandate of Congress.

DHS's argument that fees may be awarded for ancillary proceedings only if they are *necessary* to the action in which fees are sought is not unequivocally supported by the cases on which it relies. The pertinent case law relates primarily to cases involving administrative proceedings ancillary to a judicial action. In *Webb v. Dyer County Bd. of Ed.* (1985) 471 U.S. 234 [105 S.Ct. 1923, 85 L.Ed.2d 233], the federal district court decided that an African American schoolteacher, who prevailed in his section 1983 action (42 U.S.C. § 1983) challenging termination of his employment, was not entitled to attorney fees under the Civil Rights Attorney's Fees Awards Act of 1976 for time spent by counsel in pursuing optional administrative remedies before the local school board, although the teacher contended he was entitled to fees on the basis that time spent by counsel in the school board proceedings was reasonably expended in preparation for the successful court action. The Supreme Court affirmed. Noting that the federal statute authorizing fees (42 U.S.C. § 1988) only authorized fees in an "action or proceeding to enforce [section 1983]," and gave the trial court discretion whether to award fees to a prevailing party, the court observed that "[a]dministrative proceedings established to enforce tenure rights created by state law simply are not any part of the proceedings to enforce § 1983, and even

though the petitioner obtained relief from his dismissal in the later civil rights action, he is not *automatically* entitled to claim attorney's fees for time spent in the administrative process . . . ." (*Webb v. Dyer County Bd. of Ed., supra,* at p. 241 [105 S.Ct. at p. 1927], italics added, fn. omitted.) Emphasizing that, as held in *Hensley v. Eckerhart* (1983) 461 U.S. 424 [103 S.Ct. 1933, 76 L.Ed.2d 40], the amount to be awarded necessarily depends "on the facts of each case" (*id.* at p. 429 [103 S.Ct. at p. 1937]), and that "the exercise of discretion by the district court must be respected" (*Webb,* at p. 242 [105 S.Ct. at p. 1928]), the court reiterated that "the 'most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate.' " (*Ibid.,* quoting *Hensley, supra,* at p. 433 [103 S.Ct. at p. 1939].)

The question in *Webb* was "whether the time spent on the administrative work during the years before August 1979 [when the judicial action was commenced] should be included in its entirety or excluded in its entirety." (*Webb v. Dyer County Bd. of Ed., supra,* 471 U.S. at p. 243 [105 S.Ct. at p. 1929].) While the Supreme Court concluded that, on the record presented, the district court correctly held that all of the administrative work was not compensable, the court felt it necessary to " 'reemphasize that the district court has discretion in determining the amount of a fee award.' [Citation.] When such an award is appealed, the reviewing court must evaluate its reasonableness with appropriate deference." (*Id.* at p. 244 [105 S.Ct. at p. 1929], fn. omitted.) The Supreme Court clearly never intended to foreclose a fee award that compensates a prevailing party for work performed in administrative or other ancillary proceedings, particularly where, as was not the case in *Webb* but is true here, the trial court exercised its discretion to award fees in favor of the prevailing party. Subsequent to *Webb,* the high court has held that fees incurred in administrative proceedings are recoverable. (*N.C. Dept. of Transp. v. Crest St. Council* (1986) 479 U.S. 6, 15 [107 S.Ct. 336, 341-342, 93 L.Ed.2d 188].) Later, in *Sullivan v. Hudson* (1989) 490 U.S. 877 [109 S.Ct. 2248, 104 L.Ed.2d 941], the court indicated that fees may be awarded under the Equal Access to Justice Act (28 U.S.C. § 2412) for legal work performed in ancillary administrative proceedings if the administrative proceedings are "so intimately connected with judicial proceedings as to be considered part of the 'civil action' for purposes of a fee award." (*Sullivan v. Hudson, supra,* 490 U.S. at p. 892 [109 S.Ct. at p. 2253], citing *Webb, supra,* 471 U.S. 234; *Pennsylvania v. Del. Valley Citizens' Council* (1986) 478 U.S. 546 [106 S.Ct. 3088, 92 L.Ed.2d 439]; and *New York Gaslight Club, Inc. v. Carey* (1980) 447 U.S. 54 [100 S.Ct. 2024, 64 L.Ed.2d 723].)

In any event, California case law clearly provides a trial court discretion to award a fee that compensates work performed in a collateral action that

may not have been absolutely necessary to the action in which fees are awarded but was nonetheless closely related to the action in which fees are sought and useful to its resolution. In *Wallace v. Consumers Cooperative of Berkeley, Inc.* (1985) 170 Cal.App.3d 836 [216 Cal.Rptr. 649], the superior court awarded attorney fees under section 1021.5 to consumer groups which successfully challenged the validity of mandatory minimum retail milk prices. The litigation resulted in a settlement agreement providing that if the Director of the Department of Food and Agriculture conducted administrative hearings and suspended minimum prices by a certain date and dismissed a "companion action" seeking civil penalties against the plaintiff Consumers Cooperative upon the payment of $500, the plaintiffs would drop their judicial challenge as moot. After the administrative hearings were held, the director issued an order suspending minimum retail milk price regulations and also dismissed the companion judicial action for civil penalties of $19,000. The question on appeal was the propriety of the superior court order granting the plaintiffs an attorney fee award which included compensation for services rendered in both the administrative proceedings and the separate judicial action seeking civil penalties. The Court of Appeal affirmed. As to the administrative proceedings, the court noted that under federal law "the hours reasonably expended on an action may include services performed in closely related administrative proceedings." (*Id.* at p. 847, citing *Chrapliwy v. Uniroyal, Inc.* (7th Cir. 1982) 670 F.2d 760.)

The court also discussed the opinion of the United States Supreme Court in *Webb v. Dyer County Bd. of Ed., supra,* 471 U.S. 234, which had just been decided, because that opinion emphasized the highly discretionary nature of the determination whether hours were reasonably expended upon an action. (*Wallace v. Consumers Cooperative of Berkeley, Inc., supra,* 170 Cal.App.3d at p. 848.) The court stated that while the *Webb* court "held that the trial court did not abuse its discretion in denying the fees requested, the clear implication of its decision is that on a proper showing, the time 'reasonably expended' on an action may include time spent on related administrative proceedings." (*Ibid.*) Because the *Consumers Cooperative* court agreed that the related administrative proceedings "were both useful and necessary to the ultimate resolution of the action, and directly contributed to that resolution . . . it was well within the range of the trial court's discretion to determine that the attorney time expended in the administrative hearings was in effect time 'reasonably expended' in the action itself." (*Id.* at pp. 848-849.) The Court of Appeal also concluded that the fee award properly included time spent by the plaintiffs' counsel on the civil penalty action, which was not only a separate judicial proceeding, but one in which the plaintiffs did not prevail. The fact that the civil penalty action was a separate proceeding was no bar, the court stated, because "a trial court may, in its

discretion, determine that time reasonably expended on an action includes time spent on other separate but closely related court proceedings." (*Id*. at p. 849, citing *Bartholomew v. Watson* (9th Cir. 1982) 665 F.2d 910, 912-914 and *Brown v. Bathke* (8th Cir. 1978) 588 F.2d 634, 638.) The fact that the plaintiffs did not prevail in the civil penalty action also presented no bar to an attorney fee award compensating them for time spent in defending the action. Although one of the plaintiffs was required to pay a $500 penalty, the plaintiffs did succeed overall on the most significant issue—the validity of mandatory minimum retail milk prices in the state—and a plaintiff who is successful on only some claims may nonetheless be entitled to recover fees for services on the unsuccessful claims. (*Wallace, supra*, at pp. 846-847, citing *Hensley v. Eckerhart, supra*, 461 U.S. 424, 433 [103 S.Ct. 1933, 1939]; cf. *Californians for Responsible Toxics Management v. Kizer* (1989) 211 Cal.App.3d 961, 971 [259 Cal.Rptr. 599] [affirming trial court's denial of fees on ground ancillary administrative proceeding " 'was totally unrelated to the direction taken by this lawsuit' "] and *Ciani v. San Diego Trust & Savings Bank* (1994) 25 Cal.App.4th 563, 576 [30 Cal.Rptr.2d 581] [affirming the denial of fees because collateral administrative proceedings "were in no way useful or necessary nor did they directly contribute to the resolution of" the judicial proceeding].)

The principles articulated in the cases just discussed allow a trial court discretion to award fees in circumstances such as those presented in this case. The ancillary judicial proceedings with which we are here concerned related very directly to the issues presented in the action in which fees were awarded, and respondents prevailed in those proceedings. While the federal proceedings may not have been a necessary precondition of the superior court action, they materially contributed to the resolution of the constitutional issues presented to that court. The federal rulings not only relieved the superior court of burdensome adjudicative responsibilities it would otherwise have had to undertake but also diminished the work required of counsel. Furthermore, the trial court exercised its discretion whether to award fees in favor of, not against, the prevailing party. Because a ruling whether fees should be awarded requires "an intensely factual [and] pragmatic" inquiry (*Crawford v. Board of Education* (1988) 200 Cal.App.3d 1397, 1407 [246 Cal.Rptr. 806]), it is entitled to great respect and may be set aside as an abuse of discretion only if the record provides no basis for the ruling. As the record in this case provides a reasonable basis for including hours spent in the federal proceedings in the fee award, the inclusion of such hours was within the scope of the trial court's discretion.[18]

---

[18]It is worth noting that DHS has not challenged the inclusion of time spent in the federal proceedings on the ground that the claims in that case were based on federal statutes that do

2.

 DHS claims, finally, that the fee award is excessive because the hourly rate and number of compensable hours allowed by the court were inflated and unjustified. As we earlier pointed out, and DHS acknowledges, an experienced trial judge is in a much better position than an appellate court to assess the value of the legal services rendered in his or her court, and the amount of a fee awarded by such a judge will therefore not be set aside on appeal absent a showing that it is manifestly excessive in the circumstances. (*PLCM Group v. Drexler, supra,* 22 Cal.4th 1084, 1095.) Such a showing has not been made in this case.

The voluminous materials provided by respondents' counsel in support of the motion for attorney fees provides ample support for the hourly rates they requested and the number of hours for which they sought compensation. The average hourly rate set by the court, $380, reflects a determination that lead counsel, Michael S. Sorgen, was entitled to a rate of $395 per hour and his cocounsel, Dean L. Johnson, was entitled to a rate of $365 per hour. The trial court stated, and the record shows, that respondents' counsel are "highly competent." Attorney Sorgen has been a member of the bar for more than 30 years. During that period he has been lead counsel in numerous class actions and other precedent-setting cases in federal and state courts and has also served as an adjunct or visiting professor of law at Boalt Hall School of Law, Hastings College of the Law and other law schools. Attorney Johnson has held faculty appointments in health care administration at colleges or universities in California and elsewhere, and has practiced law for 10 years. A specialist in health care reimbursement, he has litigated more than 150 cases pertaining to this rather recondite subject. It is obvious from the record that Johnson's expertise materially assisted the court and facilitated adjudication of this complex case.

Respondents submitted the declarations of experts in the areas of court awarded attorney fees and health care reimbursement litigation who attested that the hourly rates requested by respondents' attorneys were in line with market rates charged during the period between 1993 and 2000 by lawyers practicing in the San Francisco Bay Area on a noncontingent basis with varying levels of skills and experience, and rates allowed by federal and state courts in comparable cases to attorneys with levels of experience

not authorize fees, and there is no other basis upon which they could have been awarded in the federal proceedings. Suffice it for us to note that California courts have awarded fees for all work on a particular issue that is relevant to both claims for which fees are authorized by statute and those to which fees are not statutorily authorized. (See Pearl, Cal. Attorney Fee Awards (Cont.Ed.Bar 2d ed. 2001) § 12.17, p. 291 and cases there cited.)

comparable to those of respondents' counsel. The declarations included extensive verifiable information regarding rates allowed by courts for counsel to successful plaintiffs in numerous specific complex civil cases litigated in Northern California during 1994 through 1999, including the years of experience of the attorneys, paralegals and law clerks whose hourly rates were judicially set. The foregoing evidence, which DHS has not disputed,[19] demonstrates that the hourly rates allowed by the trial court are within the range of reasonable rates charged by and judicially awarded comparable attorneys for comparable work.

DHS has also failed to show that the number of compensable hours allowed was unreasonably excessive. Respondents produced detailed time records describing, under oath, the number of hours they spent on the case and the nature of the work performed. Attorneys Sorgen and Johnson appear to have efficiently divided the work. Sorgen took the lead in handling the legal and procedural issues and Johnson focused upon the technical health care reimbursement issues. DHS challenges the reasonableness of the time they spent on the case by simply counting up the pages of the numerous pleadings and memoranda respondents submitted over the course of the litigation, many of which are notably short and to the point, and arguing that the length of the submissions does not justify the time taken to prepare them. The example DHS finds most egregious is the complaint, which is only six pages long. Respondents' counsel spent 39 hours preparing this document, which DHS says any competent lawyer could draft in an hour or two. We reject this analysis. The length of a document is no gauge of the time needed to prepare it. The pithy pleadings that are most effective usually require more time to prepare than the endlessly discursive and digressive documents judges often receive. Moreover, given the complexities of this case, the precise language of the concise complaint warranted the exceptional attention counsel devoted to its preparation. Judicial use of the length of a pleading or brief as a measure of the time necessary to prepare it would reward verbosity and penalize thoughtful and precise draftsmanship. Given the ponderous plethora of prolix pleadings that inundate our courts, no trial judge in his or her right mind would adopt such an approach.

The number of compensable hours allowed by the trial court was reasonable and well within the scope of its discretion.

---

[19]DHS relies almost entirely on language in *Finkelstein v. Bergna* (N.D.Cal. 1992) 804 F.Supp. 1235, suggesting that a blended rate of $250 per hour was proper because it took into account the fact that work performed by lower level associates should not be compensated at the premium rate a partner could command. We have no quarrel with the reasoning of the court in that case, but note that adjusting $250 for the inflation that has occurred during the decade that has passed since *Finkelstein v. Bergna* was decided would produce a rate not much different from that awarded in this case.

## VI.

### *Disposition*

For the foregoing reasons, the amount of prejudgment interest awarded by the court is reduced from 10 percent to 7 percent; in all other respects, the judgment is affirmed. Respondents are awarded costs on appeal.

Lambden, J., and Ruvolo, J., concurred.

Appellants' petition for review by the Supreme Court was denied August 14, 2002.