Filed 5/19/16  Ward v. Spragens CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| RICK WARD,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>JEFFREY G. SPRAGENS,<br><br>        Defendant and Respondent. | A141692<br><br>(Sonoma County<br>Super. Ct. No. SCV250356) |
| RICK WARD,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>JEFFREY G. SPRAGENS,<br><br>        Defendant and Appellant. | A143495<br><br>(Sonoma County<br>Super. Ct. No. SCV250356) |

Disputes between neighbors can be among the most prolonged, petty, and downright nasty of all litigation.  (See, e.g., *Griffin v. Northridge* (1944) 67 Cal.App.2d 69, 71–73.)  Such disputes can become notoriously bitter, sometimes even providing the motive for murder.  (See *People v. Garcia* (2005) 36 Cal.4th 777, 782–783.)  There was no murder here.  But it sure was petty and nasty—at least on the part of Rick Ward.

Ward owned the upslope property adjacent to that of Jeffrey and Joy Spragens (when referred to collectively, the Spragens).  The Spragens built a tennis court on their property, which required removal of tall trees, trees they later replaced—indeed, at the direction of Sonoma County.  Ward's reaction to the replanting was to engage in various,

1

and numerous, acts of harassment interfering with the Spragens' use of their property, especially when they were playing tennis.

Even so, the Spragens did not begin the legal proceeding here, which was initiated by Ward, who asserted a claim of nuisance to compel the Spragens to remove the replanted trees (along with a fence). The Spragens cross-complained for civil harassment and encroachment.

Following a six day trial, the jury returned a special verdict finding for the Spragens and against Ward. At the conclusion of a post trial hearing, the trial court found for the Spragens on their claim for harassment under Code of Civil Procedure section 527.6 ("section 527.6"), and by supplemental judgment enjoined Ward from "harassing, intimidating, stalking, threatening, abusing or making annoying communications, or disturbing the peace of Jeffrey and Joy Spragens . . . ." Ward appeals that judgment, and we affirm.

Following the injunction in their favor, the Spragens moved for attorney fees under section 527.6(s). The trial court denied the Spragens fees, on the basis that there was no prevailing party on the Spragens' claims under Section 527.6. The Spragens appeal from the order on that denial. We agree with them, and remand for reconsideration of the issue.

## BACKGROUND

### The Parties and the Property

Jeff Spragens, 72 years old at the time of trial, is a lawyer turned businessman who entered into the low and moderate housing business, serving as president of his affordable housing corporation for many years. He retired in late 2013. He has been married to Joy Spragens[1] for 17 years, and between them they have four children and eight grand children.

---

[1] For consistency with the briefs, we will use Jeff and Joy when describing them individually.

Joy is still active in her career as an investment advisor. She was married once before, in a "not very successful" marriage, and is now "very happily married" to Jeff. The Spragens's main home is in Washington D.C.; they also have a home in Miami Beach.

The record contains less information about Ward. We do not know his age, only that he was born in San Francisco, grew up in Marin County, came to Sonoma County at age 18, and owns a roofing company. Ward first lived in Rohnert Park and then in the Sonoma Valley, where he currently lives, in El Verano. Ward bought his property involved here for a "vacation type place close by."

In the early 1990s, before he married Joy, Jeff acquired a 25% interest in a spare 10-acre parcel at 6700 Sonoma Mountain Road, Glen Ellen (the property). The property was densely forested, with many tall oak and bay trees, large manzanitas, and toyons that shielded it from the surrounding residences. Jeff described how this held a powerful attraction for him: "It just was a wonderful, wonderful feeling of freedom and the privacy which I very, very much needed that really turned me on to it. I couldn't see any houses. I knew that our property ended at some point, but I didn't see anybody. . . . I really liked that privacy. I needed that privacy."

Joy expressed similar feelings, describing her reaction to the property when Jeff first showed it to her in the late 1990s. She too was drawn to the sense of privacy provided by the thick forestation that hid the home from the view of the road and the surrounding properties.

The solitude and tranquility of the property was especially significant to Joy, who testified about various traumatic experiences in her past, including that when she was young she and her sister had been kidnapped, and that her uncle had attempted to "get personal" with her. As an adult, Joy was the victim of a stalker, and her son was kidnapped.

In the late 1990s or early 2000s Jeff's co-owners began to sell out their interests in the property, and by 2004 Jeff had acquired full ownership of it. He and Joy decided that

3

what was now solely their property "would be a really great place to retire . . . a place where the children would all be happy to come and visit . . . ."

In 2003 Ward purchased the property adjacent to the Spragens, upslope from them, in a subdivision. As indicated, it was to be a second, or vacation, home. Ward began to remodel the home in 2005, the year Jeff met hm. And apparently then began the first of the soon-to-be escalating incidents involved here. As the Spragens brief describes it, a description unrebutted by Ward: "Tempted by the fact that his home is situated just a few feet back from the common property line [citation], in the course of his remodel Ward would regularly toss assorted construction debris over an old fence onto the Spragens' land. The Spragens responded by erecting new deer fencing along, and a foot inside, their property line."

### The Tennis Court

In November 2005 the Spragens applied to Sonoma County for the construction of a lighted tennis court. The county approved installation of the court, but not the lights. The Spragens re-applied to install the lights, which application was approved. A group of neighbors expressed opposition, and the lighting permit was revoked. The Spragens appealed that revocation, which led to several hearings, in connection with which neighbors wrote letters and spoke. We need not detail all that occurred, or who said what, or when. Suffice to say that Ward was not on the side of the Spragens.

While the lighting issue was under review, in 2006 the Spragens began construction of the tennis court without lights. This necessitated the clearing of numerous tall (30 and 40 foot) oak and bay trees from a portion of the property. When the trees were cleared, it presented the Spragens an "unwelcome surprise": elimination of their much valued sense of privacy and seclusion. For the first time, they could see their neighbors' houses, including Ward's, and their neighbors could see them. Joy described her reaction to this, and its effect: she "went to Jeff and I said; Oh, my God, what have we done?" As she later described it, "[w]e took this beautiful private place that was the biggest draw about it and we just exposed ourselves to the world."

4

For Ward, however, clearing of the trees gave him what he described to Jeff as a "great view." Ward asked Jeff if he was going to replant the cleared trees. Jeff replied, "yeah, I think we have to plant back." Ward was disappointed.

While the replanting was something the Spragens would have done regardless, the fact is that the county required them to restore what they had removed, for the benefit of all the neighbors' privacy. County planner Karin Theriault testified about this, that she told the Spragens they would be required to replant trees along their common property line with Ward. And in early 2008 the Spragens planted a row of cypress trees along the property line.

The tennis court was completed, the Spragens began to play tennis, and Ward set out on what can only be described as a concerted effort to interfere with the Spragens' enjoyment of the property, the conduct that led to the injunction against him here. Since Ward asserts that the evidence of what he did does not support the injunction, we will set forth that evidence below in connection with Ward's substantial evidence attack.

**The Pleadings**

In September 2011, Ward filed a complaint against the Spragens, alleging that the trees the Spragens had planted on their property (along a fence) was a spite fence, and that they were committing a nuisance.

In early May 2012, the Spragens filed an answer, and on May 8 a verified cross-complaint. It was styled "for private nuisance; damages; and injunctive relief," and alleged a "malicious pattern of conduct intentionally directed at" the Spragens, including "the playing [of] loud and offensive music, the yelling of foul and personal invectives at [the Spragens] and their guests, peeping at [the Spragens] and their guests, and the blowing of marijuana smoke onto [the Spragens'] tennis court."

Elaborating, the Spragens alleged as follows, "10. . . . In response to this tennis court improvement cross-defendant has engaged, and continues to engage, in a malicious pattern of conduct intentionally directed at cross-complainants at such times when they use their tennis court; said intentional conduct inclusive of the playing loud and offensive music, the yelling of foul and personal invectives at both cross-complainants and their

5

guests, peeping at cross-complainants and their guests, and the blowing of marijuana smoke onto cross-complainants' tennis court." And paragraph 14 alleged that the Spragens had become fearful and had suffered injuries to their health, strength, activity, and nervous systems as a result of Ward's conduct.

The cross-complaint also alleged Ward had encroached on the Spragens' property by constructing leach lines across their common property line without their knowledge. The cross-complaint did not assert any claim under section 527.6, and there was no request for attorney fees. The prayer for relief sought "a preliminary and a permanent injunction enjoining [Ward] and all persons acting in concert with, or for, him from engaging in the noxious personal conduct described herein and disturbing [the Spragens'] peaceful and comfortable enjoyment of their property."

On May 9, 2012, the Spragens filed their first amended cross-complaint for private nuisance, damages, and injunctive relief. Again, they did not assert a claim under Code of Civil Procedure section 527.6; again, there was no request for attorney fees. The first amended cross-complaint contained the same paragraphs 10 and 14; and the prayer included the same request for a permanent injunction preventing Ward from "engaging in the noxious personal conduct as described herein . . . ."

On October 23, 2012, Ward filed his "Answer to Verified Cross-complaint," and in the prayer he requested attorney fees.

On March 21, 2013, pursuant to a stipulation and court order, the Spragens filed their second amended cross-complaint. The second amended cross-complaint contained a single cause of action, for private nuisance. The allegations in paragraphs 10 and 14 of the first two cross-complaints were omitted from the second amended cross-complaint, as was the prayer for a permanent injunction. Rather, the Spragens sought only a mandatory injunction requiring Ward to remove encroachments on the Spragens' property. There was no request for attorney fees.

On April 16, again pursuant to stipulation and order, the Spragens filed a third amended cross-complaint. It contained a cause of action for private nuisance, and one for harassment/nuisance/injunction. The third amended cross-complaint prayed for a

6

mandatory injunction pursuant to section 527.6 compelling Ward to remove all encroachments from within the Spragens' property, and separately prayed for a prohibitory injunction against any future harassment or improper actions by Ward. The request for prohibitory injunction made no reference to section 527.6. The prayer also contained a request for "fees and costs of suit."

## The Trial, the Verdict, and the Injunction

The case proceeded to jury trial, held over six days in January, 2014. Ward called seven witnesses, including himself. Seven witnesses testified for the Spragens, including both of them. Following concluding instructions, the case was in the hands of the jury at the close of January 21. The next day, following less than three hours of deliberations, the jury returned a special verdict finding against Ward and in favor of the Spragens. As to the special verdict on the cross-complaint, the jury answered all seven questions favorable to the Spragens, including answering "yes" to these three questions: (1) Did Ward create or permit a condition to exist that was "a. harmful to Jeffrey and/or Joy Spragens' health; or [¶] b. indecent or offensive to the senses; or [¶] c. an obstruction to the free use of the property, so as to interfere with the comfortable enjoyment of life or property."; (2) "Did this condition interfere with Jeffrey or Joy Spragens' use or enjoyment of their land?"; and (3) Was Ward's conduct a substantial factor in causing harm to Jeff or Joy?

The next day, the trial court entered judgment on that verdict. As pertinent here, it decreed that "Cross-Complainants Jeffrey and Joy Spragens shall recover against Cross-Defendant Rick Ward on their cross-complaint and are entitled to injunctive relief against Rick Ward, based on the jury's findings, which orders shall be issued by the court after a hearing."

The judgment also recited that the "Spragens are the prevailing parties and are entitled to seek costs and/or fees as allowed by law."

## The Post Trial Proceedings

Ward filed motions for a new trial and for judgment notwithstanding the verdict. Among other things, Ward argued that while the Spragens might be entitled to a "simple

7

injunction," the court should not grant an injunction under section 527.6 because such an injunction would be overbroad if it encompassed members of Ward's household.  Ward made no argument as to the form of the Spragens' pleadings, or the absence of personal service, or the holding of a trial rather than an expedited hearing.

The Spragens's opposition asserted it was the province of the trial court to make the necessary factual findings to support their request for an injunction under section 527.6.  In their words:  "The . . . harassment, although supported by the jury's advisory verdict, must be made by the trial court."

The trial court denied both of Ward's motions.  Doing so, the court held that the Spragens had sufficiently proven that Ward had continuously harassed them up to the time he filed his complaint, rejecting Ward's argument that there was no need for an injunction because he had ceased his harassment after filing suit.  To the contrary, the court held that the "Spragens introduced credible evidence that the harassment continued up to the time of filing of the lawsuit.  Ward did not persuasively refute this evidence.  Ward failed to meet his burden of proof on the statute of limitations defense.  The absence of ongoing improper conduct by Ward during the pendency of the action, which is uncontroverted and is acknowledged by the court, is not a basis for denying relief to Spragens.  If it were, some parties sued for harassment could avoid an adverse judgment based solely on delays in getting to trial, without regard to the merits of the action.  The Cross-complaint was timely filed; the jury found in Spragens' favor; they are entitled to injunctive relief."

Following further discussion, the order concluded "[t]he Spragens are entitled to an injunction against Ward preventing him from harassing them."

The court also found that while the "Spragens did prove that they own one foot of land on Ward's side of the privacy fence," it recognized they had previously offered at trial to allow Ward's encroachments to remain in place.  The trial court "denie[d] Spragens' request for a mandatory injunction requiring Ward to remove these improvements."

On April 14 the court entered a supplemental judgment, holding as follows: "Ward's actions and behavior toward the Spragens constitute harassment pursuant to CCP §527.6(b)(6)(A), and nuisance. Rick Ward is hereby enjoined from harassing, intimidating, stalking, threatening, abusing or making annoying communications, or disturbing the peace of Jeffrey and Joy Spragens or their guests." The court confirmed that the Spragens were "the prevailing parties and are entitled to seek costs and/or fees as allowed by law."

Following the supplemental judgment, the Spragens moved for attorney fees under section 527.6(s), seeking $287,172.61. Ward filed opposition, the Spragens a reply, and the motion came on for hearing on July 9. By order dated October 6, the court denied the motion for attorney fees.

Ward filed an appeal of the judgment, and the Spragens filed a cross-appeal of the denial of their fee motion. We ordered the appeals consolidated.

## DISCUSSION

### The Civil Harassment Order Is Proper, and Supported by the Record.

### Introduction

Ward makes one fundamental argument on appeal, that the trial court erred in granting the Spragens injunctive relief under section 527.6. The argument has seven sub-parts, four of which might be called procedural in nature, the other three substantive. We will discuss them in turn. Before doing so, however, we note that Ward's argument is set forth in a brief that ignores several rules of appellate procedure, most especially in the way Ward sets out the facts, which is to recite the facts based essentially on his version of them, not those that support what the jury and the trial court concluded below. This is most improper.

California Rules of Court, rule 8.204(a)(2)(C) provides that an appellant's opening brief shall "[p]rovide a summary of the significant facts . . . ." As to this, the leading California appellate practice guide instructs as follows: "Before addressing the legal issues, your brief should *accurately and fairly* state the critical facts (including the evidence), free of bias; and likewise as to the applicable law. [Citation.] [¶]

9

Misstatements, misrepresentations and/or material omissions of the relevant facts or law can instantly 'undo' an otherwise effective brief, waiving issues and argument; it will certainly cast doubt on your credibility, may draw sanctions [citation], and may well cause you to *lose the case*!" (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2015) ¶ 9:27, p. 9-8.) Ward's brief ignores such instruction. And the law.

" 'It is well established that a reviewing court starts with the presumption that the record contains evidence to sustain every finding of fact.' [Citations.] Defendant's contention herein 'requires defendants to demonstrate that there is *no* substantial evidence to support the challenged findings.' (Italics added.) [Citations.] A recitation of only defendants' evidence is not the 'demonstration' contemplated under the above rule. [Citation.] Accordingly, if, as defendants here contend, 'some particular issue of fact is not sustained, they are required to set forth in their brief *all* the material evidence on the point and *not merely their own evidence*. Unless this is done the error is deemed to be waived.' (Italics added.) [Citations.]" (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881; accord, *In re Marriage of Fink* (1979) 25 Cal.3d 877, 887; see generally 9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, §365, pp. 421–423, and §368, pp. 425–426.)

Despite Ward's flouting of those rules, we turn to Ward's arguments.

**The Procedural Arguments Were Waived Below.**
**They Cannot Be Considered Here**

Ward's four procedural arguments are essentially premised on the claim that the cross-complaint was an improper way to assert the claim against him, that the issue should not have been decided as it was. Ward's arguments are that: (1) The Spragens had to proceed via the Judicial Council forms, use of which is mandatory; (2) A petition for a restraining order must be personally served; (3) "A hearing—not a trial—must be held within 25 days"; and (4) "The Spragens' deficient cross-complaint did not request injunctive relief for harassment under section 527.6."

10

All four of the Spragens's cross-complaints are discussed above, including the third amended, on which the matter proceeded. And there is no doubt that section 527.6 was in it, although, as the Spragens acknowledge, only in part of the prayer. Ward answered the cross-complaint, and at no time did he assert any defect in the procedure—no failure to state a claim; no motion to strike; no lack of jurisdiction; nothing. Nowhere below did Ward contend that a mandatory form had to be used. Nowhere that he was not properly served. And nowhere that the proceeding was improper.

Not only that, at trial Ward did not deny that he knew the Spragens were claiming he "harassed them or aggravated them." His attorney said the jury verdict was "fine," a verdict that asked the jury to answer the questions noted above, questions germane to section 527.6. And not only does the record below demonstrate that Ward knew the issue was confronting him, his counsel expressly acknowledged this on at least three occasions where, contending that any injunction should not include family members, counsel conceded that an injunction against Ward himself could be appropriate.

In sum, even assuming there were defects in the procedure—an issue Ward does not demonstrate, and an issue we do not decide—Ward waived them, as have many other parties who proceeded in the face of claimed procedural deficiencies. Numerous courts have applied this rule, including ourselves, in *Children's Hospital & Medical Center v. Bonta* (2002) 97 Cal.App.4th 740, 776 (*Bonta*), where we held an " 'appellate court will not consider procedural defects or erroneous rulings where an objection could have been, but was not, raised in the court below.' " (Accord, *Steven W. v. Matthew S.* (1995) 33 Cal.App.4th 1108, 1117; *Ferraro v. Southern Cal. Gas Co.* (1980) 102 Cal.App.3d 33, 44 [compulsory joinder waived by failure to object.].)

Not only does the rule of waiver defeat Ward's procedural argument, so does one of the fundamental reasons for the rule, that the claimed error can be addressed at trial if it is brought to the attention of the court. Certainly, the claim that the Spragens did not use the right form or did not personally serve Ward could have been addressed if raised below. As to Ward's claim that the hearing was inappropriate, we do not understand the

11

argument, as Ward was given the opportunity to resist the claims, including the ability to do discovery.  He was, in the words of the law, given a "full opportunity to present his . . . case." (*Ensworth v. Mullvain* (1990) 224 Cal.App.3d 1105, 1110.)

Ward's final procedural claim, that somehow the cross-complaint was inadequate, is equally futile.  To begin with, the fact that section 527.6 was not mentioned in a prayer for relief is of no consequence, because "the nature of an action is not determined by the prayer, but by the factual allegations of the body of the complaint."  (*Lubin v. Lubin* (1956) 144 Cal.App.2d 781, 793.)  "It is elementary that the prayer is no part of the statement of the cause of action [citations] and that the issues involved are determinable from the facts alleged rather than from the prayer." (*Berg v. Investors Real Estate Loan Co.* (1962) 207 Cal.App.2d 808, 815.)

All involved here—Ward, the court, and the jury—understood that the Spragens were seeking to enjoin his ongoing harassment.  The Spragens' second cause of action was entitled "Harassment/Nuisance/Injunction."  The jury found Ward's behavior constituted a nuisance that "an ordinary person [would] have been reasonably annoyed or disturbed by."  And the court separately found that "Ward's actions and behavior toward the Spragens constitue[d] harassment pursuant to CCP §527.6(b)(6)(A) . . . ."

Ward's procedural arguments are also barred by the rule that he cannot make an argument on appeal that he did not make below.  This is the well established theory of trial doctrine, as described, for example, in the leading appellate treatise:  "As a general rule, theories not raised in the trial court cannot be asserted for the first time on appeal; appealing parties must adhere to the theory (or theories) on which their cases were tried. This rule is based on fairness—it would be unfair, both to the trial court and the opposing litigants, to permit a change of theory on appeal; and it also reflects principals of *estoppel* and *waiver* (¶8:244 ff.).  [Citation.]  [*Greenwich S.F., LLC v. Wong* (2010) 190 [Cal.App.4th] 739, 767; *Giraldo v. California Dept. of Corrections & Rehabilitation* (2008) 168 [Cal.App.4th] 231, 251; [Citations.]"  (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2015) ¶ 8.229, p. 8-167.)  To the same effect see *Amato v. Mercury Casualty Co.* (1993) 18 Cal.App.4th 1784, 1794 ["It must appear

from the record that the issue argued on appeal was raised in the trial court. If not, the issue is waived."]; *Ochoa v. Pacific Gas & Electric Co.* (1998) 61 Cal.App.4th 1480, 1488, fn. 3: ["It is axiomatic that arguments not asserted below are waived and will not be considered for the first time on appeal."]

This rule applies to bar a defendant—here, cross-defendant Ward—from asserting a theory for the first time on appeal. (*Bardis v. Oates* (2004) 119 Cal.App.4th 1,13, fn. 6; *Lucich v. City of Oakland* (1993) 19 Cal.App.4th 494, 498.) In short, a party who permitted the case to be tried on the assumption the pleadings raised a certain issue cannot claim on appeal that the pleadings did not raise that issue. (*Hilliard v. A.H. Robins Co.* (1983) 148 Cal.App.3d 374, 392.)

To sum up here, as we did in *Bonta, supra*, "[Ward] has 'doubly waived' the right to present this argument on appeal. [Citation.] First, the theory was never presented to the trial court . . . . Had it been presented, and had the court agreed, the problem could easily have been rectified, which may be the reason the argument was never raised. 'An appellate court will not consider procedural defects or erroneous rulings where an objection could have been, but was not, raised in the court below.' [Citation.] It is unfair to the trial judge and to the adverse party to take advantage of an alleged error on appeal where it could easily have been corrected at trial." (97 Cal.App.4th at pp. 776–777.)

### Ward's Substantive Arguments Have No Merit: The Civil Harassment Order Is Supported by the Record

As noted, Ward's argument contains three subparts that can be considered substantive: (1) an injunction shall issue only upon proof by clear and convincing evidence; (2) the evidence does not support issuance of the injunction; and (3) the scope of the injunction exceeds what is permitted under section 527.6. We consider them together—and easily reject them.

### The Standard of Review

"The appropriate test on appeal is whether the findings (express and implied) that support the trial court's entry of the restraining order are justified by substantial evidence in the record. (*Bookout v. Nielsen* (2007) 155 Cal.App.4th 1131, 1137–1138 [injunctions

13

under § 527.6 are reviewed to determine whether factual findings are supported by substantial evidence; trial court's determination of controverted facts will not be disturbed on appeal].)" (*R.D. v. P.M.* (2011) 202 Cal.App.4th 181, 188.) This principle is equally applicable to findings that may be implied on appeal to support a trial court's order (*Michael U. v. Jamie B.* (1985) 39 Cal.3d 787, 793; *Kulko v. Superior Court* (1977) 19 Cal.3d 514, 519, fn. 1), including, as particularly apt here, appeals from injunctions under section 527.6. (*R.D. v. P.M., supra*, 202 Cal.App.4th at p. 188.)

*Schild v. Rubin* (1991) 232 Cal.App.3d 755, 762, a case relied on by Ward, describes this principle in a section 527.6 case: "In assessing whether substantial evidence supports the requisite elements of willful harassment, as defined in Code of Civil Procedure section 527.6, we review the evidence before the trial court in accordance with the customary rules of appellate review. We resolve all factual conflicts and questions of credibility in favor of the prevailing party and indulge in all legitimate and reasonable inferences to uphold the finding of the trial court if it is supported by substantial evidence which is reasonable, credible and of solid value. (*Nestle v. City of Santa Monica* (1972) 6 Cal.3d 920, 925; [Citations.].)"

The substantial evidence rule applies without regard to the standard of proof required at trial. Put otherwise, the standard of review remains substantial evidence even if the standard below is " 'clear and convincing' " evidence. (See *Crail v. Blakely* (1973) 8 Cal.3d 744, 750; *In re Marriage of Ruelas* (2007) 154 Cal.App.4th 339, 345.) As one Court of Appeal put it: " 'Thus, on appeal from a judgment required to be based upon clear and convincing evidence, "the clear and convincing test disappears . . . [and] the usual rule of conflicting evidence is applied, giving full effect to the respondent's evidence, however slight, and disregarding the appellant's evidence, however strong." [Citation.]' " (*In re Mark L.* (2001) 94 Cal.App.4th 573, 580–581.)

In light of those rules, we turn to the evidence here.

### The Evidence of Harassment

As indicated, Ward was not happy when Jeff told him the Spragens would be replanting the trees that had been removed, and thus began what can only be called a

14

vendetta against them, which apparently began when he first learned of the fact, yelling to the Spragens even before the replanting began, that they were going to "hurt my view." There followed Ward's first act of harassment, setting up a pair of radios facing the Spragens' direction, and playing them at full volume until the Spragens finished their tennis game and went inside.

With time, Ward became, as the Spragens describe it, "increasingly inventive in his harassment." For example, when the Spragens would try to play tennis, Ward would bang on garbage can lids, or turn on a leaf blower left sitting pointed at the Spragens. This noise-making would commence with the Spragens' tennis playing, and end when the tennis ended. Neighbor Charles Jones confirmed this behavior, including that he saw Ward "put down the blower and walk away and it was there for at least 40 minutes of just sitting."

Ward also blew marijuana smoke down at the Spragens property while they were playing tennis, which was particularly irritating to Joy, who has asthma. This resulted in the Spragens calling the sheriff to the scene on at least three occasions.

But the worst was yet to come.

In early 2008, the Spragens began the actual replanting. Shortly thereafter Ward threatened that "[i]f you don't . . . [re]move these trees, it's gonna be war." He would constantly yell at the Spragens, demanding "when are you going to take these trees down?" He also began watching the Spragens as they played tennis, and making rude and provocative sounds and comments, many of a sexual nature. As Jeff described it: "[W]hen [Joy] hit her back hand, sometimes forehands, [Ward] would play on that and say, (indicating) baby, that sounds good or he would—starting [*sic*] to make sexual things out of that noise. And that was really disturbing to my wife and to me and it—at those points we quit and left." Similarly inappropriate comments were directed at Joy, including asking her—while she was playing—"[d]o you want a real man to come down and play?"

Neighbor Charles Jones again confirmed such outrageous conduct, and Ward's express motive in doing what he did. Thus:

"Q.  [MR. SIMON, Attorney for Spragens]  Did you have occasion to hear the Spragens play tennis from time to time?

"A.  [MR. JONES]  Yes.

"Q.  Have you ever been around when Mr. Ward was present while they were playing tennis?

"A.  Yes.

"Q.  Have you ever experienced or witnessed Mr. Ward interact with the Spragens' [*sic*] while they're playing tennis?

"A.  Yes.

"Q.  What have you witnessed?  [¶] . . . [¶]

"THE WITNESS:  Um, I've been there several times when he's been there.  And he's very obnoxious and noisy.  He's very intimidating towards Mrs. Spragens.

"MR. SIMON:  What have you witnessed Mr. Ward do to the Spragens while they're playing tennis?

"THE WITNESS:  Well, Mrs. Spragen [*sic*] makes noise when she hits the ball.  It sounds something like this—it sounds like—indicating well, [Ward] would sit up there and he would make it a sexual sound which would be more like—indicating—and he was doing this on purpose.  How do I know this?  Because he told me.  [¶] . . . [¶]

"MR. SIMON:  Did Mr. Ward ever tell you he was doing it on purpose?

"THE WITNESS:  Yes.

"Q.  What did he tell you?

"A.  I was up there one day with him, we were talking, they were out there playing, she was hitting the ball.  He started making noises.  I looked at him, why?  He said, I don't like the way she's playing, makes all that noise while we're back here.  That was his answer.

"Q.  In addition to making the noises, did you hear him say words while he was making the noises?

"A.  He would make more gestures and sounds than anything.  [¶] . . . [¶]

16

"MR. SIMON:  Did you ever . . . hear him say anything that had a sexual connotation?  [¶] . . . [¶]

"THE WITNESS:  Yes, he would.  He would make sexual connotation sounds.  I didn't think it was very nice of him and—but he did it anyway . . . ."

In May 2010 the Spragens built a six-foot fence along the property line, doing so because the trees were not enough, as they could still see him, and he them.  To little avail.

In the summer of 2011, the Spragens were enjoying a family reunion with Jeff's daughter and her family, including two pre-school children.  Ward "popped his head up over the privacy fence" and sang what all described as a "sing-song melody constructed around the word 'asshole.' "  Jeff's son-in-law described it this way:  "[T]he main focus of the song kind of had one word in it.  It was asshole.  You know, asshole—just various tones of asshole.  And it went on for awhile. . . .  But the song kept going on.  It would slow down and then start up again, 30 seconds, a minute.  My son was down with a nanny at the swimming pool with his friend Alex and I didn't—they weren't supposed to come up, but they came running up the hill, they wanted to see what we've been doing. . . .  So we saw them coming up and the singing started again and asshole, asshole, it is loud—it is very disruptive . . . .  After he [Ward] left, we played for a little bit longer, but then we just—you know, it kind of ruined the moment, so we just folded up and went back down to the house."

Based on that, and more, the trial court entered the civil harassment order.  It was proper.

### The Law

Section 527.6 provides in pertinent part as follows:

"(a)(1)  A person who has suffered harassment as defined in subdivision (b) may seek a temporary restraining order and an order after hearing prohibiting harassment as provided in this section.  [¶] . . . [¶]

"(b)  For purposes of this section:

17

"(1) 'Course of conduct' is a pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose, including following or stalking an individual, making harassing telephone calls to an individual, or sending harassing correspondence to an individual by any means, including, but not limited to, the use of public or private mails, interoffice mail, facsimile, or computer email. Constitutionally protected activity is not included within the meaning of 'course of conduct.'

"(2) 'Credible threat of violence' is a knowing and willful statement or course of conduct that would place a reasonable person in fear for his or her safety, or the safety of his or her immediate family, and that serves no legitimate purpose.

"(3) 'Harassment' is unlawful violence, a credible threat of violence, or a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, or harasses the person, and that serves no legitimate purpose. The course of conduct must be such as would cause a reasonable person to suffer substantial emotional distress, and must actually cause substantial emotional distress to the petitioner."

Section 527.6 was intended " 'to protect the individual's right to pursue safety, happiness and privacy as guaranteed by the California Constitution.' " (*Brekke v. Wills* (2005) 125 Cal.App.4th 1400, 1412; *Huntingdon Life Sciences, Inc. v. Stop Huntingdon Animal Cruelty USA, Inc.* (2005) 129 Cal.App.4th 1228, 1250.)

That law fully supports the injunction in light of the facts here. Also in light of its effect on the Spragens, especially Joy.

Quoting section 527.6 (b)(3), Ward states that "[a]ny claim by the Spragens that they meet these standards is absurd on its face." The hyperbole is misguided.

As quoted, subdivision (b)(3) provides that "[t]he course of conduct must be such as would cause a reasonable person to suffer substantial emotional distress, and must actually cause substantial emotional distress to the petitioner." Focusing on one thing, and one thing only, Ward asserts that the Spragens did not seek injunctive relief until they filed their cross-complaint. And so the argument runs: "These facts belie any claim by the Spragens that they were 'seriously' alarmed, annoyed or harassed, or that they

18

suffered 'substantial' emotional distress. Had that actually been the case, they could have, and should have, immediately filed a petition for injunctive relief at the time the conduct occurred—not nineteen months later. [¶] Even if the Spragens' nineteen month delay is ignored, they would still have to prove that they (or at least one of them) actually suffered 'substantial' emotional distress. Code Civ. Proc., § 527.6, subd. (b)(3)." Ward is wrong.

To begin with, it is not necessary that there be direct testimony by the victim that he or she suffered emotional distress as a result of the harassment. If the evidence otherwise raises an inference of such distress, it is sufficient to support an injunction. (*Ensworth v. Mullvain, supra,* 224 Cal.App.3d at pps. 1110–1111.) Nor is it necessary to show physical consequences of the emotional distress, as "it is well established [in California] that recovery may be had for emotional distress alone without resulting physical disability." (*Fletcher v. Western National Life Ins. Co.* (1970) 10 Cal.App.3d 376, 396–397.)

But there was such evidence here.

Beginning with Jeff, while he initially tried to ignore Ward's obnoxious behavior, as it became more abusive toward Joy he reached the point that Ward's conduct was such that it was "hard for a husband to sit and talk about stuff like this. So how should I react when somebody does this toward my wife? I'm a civilized guy. I just don't want it to happen and I want privacy."

As to Joy, Ward's behavior had a far more disturbing effect, in part because of the traumas she suffered throughout her life, including having been kidnapped as a child, exposed to a pedophile as an adolescent, and stalked as an adult. Moreover, there had been a number of recent burglaries and trespasses at the property, as a result of which the Spragens had installed security cameras and a gate at their property, engaged a private security firm, and, as Ward's harassment continued, ordered a background check on him, the results of which gave her even greater concern for her safety.

The Spragens were also advised by their neighbors, Wendy and Charles Jones, about various experiences they had with Ward. These included his spinning the wheels

19

of his truck in a way to "intentionally . . . irritate [their] dogs," including throwing nails at them. On a more personal level, Wendy Jones told Joy how Ward would "leer into the window" as he drove by. As Wendy described it, "Ward . . . sits up in his chair and . . . kind of looks over right into the window kind of like he's looking in on us . . . on our lives basically."

Jeff described Ward's conduct as "consistent" and "persistent." Joy expressed how she was affected by what he was "saying and yelling," perhaps culminating one day when Jeff was away and Joy was alone on the tennis court, hitting balls. And what happened was described in this riveting testimony that concluded Joy's direct examination:

"[A]ll of a sudden I heard Mr. Ward's voice, and this was a time that he was up above kind of the fence, and this time it was different. It was loud enough so that I could hear it, but it wasn't yelling at the same way, and he said I haven't seen your husband for a few days. But he said it in a voice that reminded me of this man who used to telephone. It was an eerie [*sic*]. It is hard to—it is hard to kind of mimic this. And he said he's not here, is he? . . . . Like he's back east or something like that. But he said these things very slowly and very—in a way that really frightened me. And then he said you're alone, aren't you? You're all by yourself down there, aren't you? I'm sorry. I still get chills. I dropped my racquet, I left the balls where they were, I went as quickly as I could to the house and I got into the house and Bob, who's our caretaker, could tell something was wrong. He said; are you okay? What's the matter? And I couldn't—I was like, (indicating)—I couldn't. I don't know if you've ever had these nightmares. Sometimes I would have nightmares where something was happening and I couldn't—I would open my mouth to scream and nothing would come out. It was like that. And I couldn't see anything for a few minutes. And when I gathered myself, I called my husband. I couldn't get him. I guess he was in a meeting or something. And so I booked the next flight out that I could get and I left."

Following that testimony, Joy was asked what she wanted from the lawsuit. She said: "I just want to be left alone. I just want privacy. I do not want to see him, I don't

want to hear him, I don't want to smell him, I don't want him to see me, I don't want him to yell at us or to leer at us or to bother us in any, any way ever again."

### Denial of Attorney Fees Was on an Improper Basis

As indicated above, following their success on the cross-complaint, the Spragens moved for attorney fees pursuant to section 527.6(s). Ward filed opposition, the Spragens a reply, and the motion came on for hearing on July 9, 2014. On October 1 the trial court filed its order denying attorney fees. The order was thorough, the court devoting almost two pages to a description of the four cross-complaints the Spragens had filed. The court then made its "[a]nalysis," concluding as follows:

"Based on the stipulation to allow the filing of the First Amended Complaint and the Third Amended Cross-complaint, the Spragens' request for attorney's fees was properly before the court. The parties have asserted a number of arguments in support of and in opposition to the Spragens' fee request. The court will not reach all of those arguments here. Under Section 527.6(r) the prevailing party in an action under Section 527.6 may be awarded court costs and attorney's fees. Thus, the court must determine who the prevailing party was on the Spragens' claims under Section 527.6. While the Spragens did prevail on their claim for a prohibitory injunction against Ward, they were not successful on their claim for a mandatory injunction requiring Ward to remove encroachments from his side of the Spragens' 'boundary' fence. The Spragens sought both of these injunctions in a post-trial motion. By order filed March 24, 2014, the court denied the motion for the mandatory injunction, requiring Ward to remove the encroachments, and granted the prohibitory injunction preventing Ward from harassing the Spragens. Accordingly, the court finds that there was no prevailing party on the Spragens' claims under Section 527.6 and therefore denies their request for attorney's fees. [¶] ORDER [¶] The Spragens' motion for attorneys' fees is hereby denied."

The Spragens appeal the denial of the fees, fundamentally arguing that the trial court originally found they were prevailing parties and later that they were not. In the words of their brief, "[t]he court also explicitly declared, not once but twice, that the 'Spragens are the prevailing parties and are entitled to seek costs and/or fees as allowed

21

by law.' [Citations.] [¶] The court erred, however, in later reversing itself to declare there was no prevailing party under the Spragens' harassment claim. [Citation.]" We agree.

Section 527.6(s) provides that "the prevailing party" in an action brought under the section "may be awarded court costs and attorney's fees, if any." May, of course, is not mandatory, and the Spragens point to no case that says the trial court had to award them fees—even if they were prevailing parties. As our colleagues in Division Four confirmed in *Krug v. Maschmeier* (2009) 172 Cal.App.4th 796, 802 (*Krug*), "As already noted, section 527.6(i) states that the prevailing party 'may' be awarded attorney fees. The normal rule of statutory construction is that when the Legislature provides that a court or other decisionmaking body 'may' do an act, the statute is permissive, and grants discretion to the decision maker. (See, e.g., *Lewis v. Clarke* (2003) 108 Cal.App.4th 563, 569; *Woodbury v. Brown-Dempsey* (2003) 108 Cal.App.4th 421, 433.)" This, of course, is consistent with the attorney fee cases decided under section 527.6, all of which hold that the award of attorney fees is discretionary. (*Krug, supra*, 172 Cal.App.4th at p. 802; *Adler v. Valclus* (1993) 21 Cal.App.4th 1770, 1776–1777; *Elster v. Friedman* (1989) 211 Cal.App.3d 1439, 1444.) In light of the above, the trial court could have denied attorney fees in its discretion.

But it did not. Rather, following the detailed analysis noted above, the trial court concluded that, despite its conclusion that "Ward's actions and behavior toward the Spragens constitute harassment" pursuant to section 527.6, the Spragens were nevertheless not prevailing parties under that section because the court "denied the motion for the mandatory injunction." While it is true that the court denied the motion for mandatory injunction, we do not understand that the injunction—one sought to remove encroachments—could possibly be sought under section 527.6. To put in conversely, while the Spragens might not have been 100 percent successful on their overall cross-complaint, they were successful on their claim for harassment under section 527.6—a statute, not incidentally, entitled "Harassment."

22

## DISPOSITION

The injunction against Ward is affirmed.   The order denying the Spragens attorney fees is reversed and the matter is remanded for a determination of the fee issue in light of the applicable law.  The Spragens shall recover costs on appeal.

_____
Richman, J.

We concur:

_____
Kline, P.J.

_____
Miller, J.

A143495/A141692; *Ward v. Spragens*